861 F.2d 270
 28 ERC 1305, 274 U.S.App.D.C. 37, 57
USLW 2263,
19 Envtl. L. Rep. 20,059
 HAZARDOUS WASTE TREATMENT COUNCIL, Petitioner,
Association of Petroleum Re-Refiners, Petitioner,
and
Natural Resources Defense Council, Inc., Petitioner,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., Respondents,
Edison Electric Institute, et al., Intervenors [HWTC I].
 Nos. 86-1658, 87-1082 and 87-1092.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 7, 1988.
Decided Oct. 7, 1988.
 
 David R. Case, Washington, D.C., and Jacqueline M. Warren, New York City, with whom Charles S. Warren, Pittsburgh, Pa., was on the joint brief, for petitioners. Jane L. Bloom, New York City, also entered an appearance for petitioner Natural Resources Defense Council.
 Brian V. Faller, Attorney, Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. Gen., and Steven E. Silverman, Attorney, E.P.A., Washington, D.C., were on the brief, for respondents.
 Christopher Harris, with whom G. William Frick and Catherine Eshelman (for American Petroleum Institute), Toni K. Allen and Douglas H. Greene (for Edison Electrice Institute), Douglas I. Greenhaus (for Nat. Auto. Dealers Ass'n), Alan J. Thiemann (for Nat. Ass'n of Truck Stop Operators), Patrick Cavanaugh, Washington, D.C., (for Nat. Oil Recyclers Ass'n), and Dimitri G. Daskal (for Service Station Dealers of America) were on the joint brief, for intervenors. Sue M. Briggum entered an appearance for intervenor Edison Elec. Institute in No. 86-1658, Frank E. McCarthy, Washington, D.C., entered an appearance for intervenor Nat. Auto. Dealers Ass'n in No. 86-1658, and Arnold S. Block, Philadelphia, Pa., entered an appearance for intervenor American Petroleum Institute in all cases.
 Before BUCKLEY and WILLIAMS, Circuit Judges, and EDWARD D. RE,* Chief Judge, U.S. Court of International Trade.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 BUCKLEY, Circuit Judge:
 
 
 1
 Petitioners challenge a final determination by the Environmental Protection Agency not to list used oil destined for recycling and recycled oil as hazardous wastes. The Agency premised this conclusion on its finding that such a listing would attach the stigma of the label "hazardous waste" to recycled oil, thus discouraging recycling and its environmentally beneficial effects. As we conclude that the statute does not permit the Agency to consider these stigmatic consequences in deciding whether to list recycled oil as a hazardous waste, we grant the petitions for review.
 
 I. BACKGROUND
 
 2
 This case requires us to find our way through a maze of statutes dealing with hazardous wastes, each of which we describe in chronological order of their enactment. Congress first dealt with the problem in the Resource Conservation and Recovery Act of 1976 ("RCRA"), Pub.L.No. 94-580, 90 Stat. 2795, which it substantially revised in the Solid Waste Disposal Act Amendments of 1980, Pub.L.No. 96-482, 94 Stat. 2334. Together, these statutes provide a comprehensive framework for the regulation by the Environmental Protection Agency ("EPA" or "Agency") of the treatment, storage, and disposal of hazardous wastes.
 
 
 3
 This regulatory scheme applies in two circumstances: when the EPA identifies, or "lists," a substance as a hazardous waste, and when the waste exhibits the characteristics of hazardous waste. The RCRA requires the EPA to promulgate regulations identifying those characteristics according to technical criteria such as "toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics." 42 U.S.C. Sec. 6921(a) (1982). These regulations appear at 40 C.F.R. Secs. 261.20-.24 (1987). The EPA's listing decision also is based on these technical criteria supplemented by other factors. Id. at Secs. 261.10-.11.
 
 
 4
 At approximately the same time as the amendments to the RCRA took effect, Congress enacted the Used Oil Recycling Act of 1980 ("UORA"), Pub.L.No. 96-463, 94 Stat. 2055 (1980). Two provisions of that act are relevant to the present case. Section 7, now codified as amended at 42 U.S.C. Sec. 6935(a) (1982 & Supp. II 1984), provided:
 
 
 5
 Not later than [October 15, 1981], the Administrator [of the EPA] shall promulgate regulations establishing such performance standards and other requirements as may be necessary to protect the public health and the environment from hazards associated with recycled oil. In developing such regulations, the Administrator shall conduct an analysis of the economic impact of the regulations on the oil recycling industry. The Administrator shall ensure that such regulations do not discourage the recovery or recycling of used oil.
 
 
 6
 "Recycled oil" means "any used oil which is reused, following its original use, for any purpose.... Such term includes oil which is re-refined, reclaimed, burned or reprocessed." 49 U.S.C. Sec. 6903(37) (1982). UORA's section 7 permits the EPA to regulate recycled oil without classifying it as a hazardous waste.
 
 Section 8 of the UORA provided:
 
 7
 Not later than [January 14, 1981], the Administrator ... shall--
 
 
 8
 (1) make a determination as to the applicability to used oil of the criteria and regulations promulgated under [RCRA, 42 U.S.C. Sec. 6921] relating to the characteristics of hazardous wastes, and(2) report to the Congress the determination together with a detailed statement of the data and other information upon which the determination is based.
 
 
 9
 In making a determination under paragraph (1), the Administrator shall ensure that the recovery and reuse of used oil are not discouraged.
 
 
 10
 94 Stat. at 2058 (uncodified). Section 8 did not direct the EPA to list used oil, but merely to "determin[e]" whether used oil meets the statutory and regulatory criteria, and then report that determination to Congress. The Agency complied with section 8, reporting to Congress its determination that certain types of used oils should be listed as a hazardous waste because of their toxic constituents.
 
 
 11
 Despite its report, the EPA failed to act on its determination by listing these used oils as hazardous wastes. Congress adopted sections 241-42 of the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), codified at 42 U.S.C. Sec. 6935 (Supp. II 1984), as a "further prod" to the Agency. H.Rep.No. 198, pt. I, 98th Cong., 1st Sess. 64 (1983), U.S.Code Cong. & Admin.News 1984, 5576. The HSWA requires the EPA to decide within a specified time whether to list used oils as hazardous:
 
 
 12
 Not later than [November 8, 1985], the Administrator shall propose whether to list or identify used automobile and truck crankcase oil as hazardous waste under section 6921 of ... title . Not later than [November 8, 1986], the Administrator shall make a final determination whether to list or identify used automobile and truck crankcase oil and other used oil as hazardous wastes under section 6921....
 
 
 13
 42 U.S.C. Sec. 6935(b) (Supp. II 1984). The HSWA exempts the generators and transporters of used oil that the Agency listed as hazardous from the regulations ordinarily applicable to hazardous wastes if the used oil is recycled. Id. at Sec. 6935(c)(1). The HSWA further directs the EPA to promulgate standards concerning the generation and transportation of such recycled oil, "tak[ing] into account the effect of such regulations on environmentally acceptable types of used oil recycling...." Id. at Sec. 6935(c)(2)(A). The HSWA also lightens the regulatory load on recyclers. Id. at Sec. 6935(d).
 
 
 14
 Soon after the HSWA was enacted, the EPA proposed to list used oil as a hazardous waste because it met the criteria for listing under 42 U.S.C. Sec. 6921. 50 Fed.Reg. 49,258, 49,260 (proposed Nov. 29, 1985). After the close of the public comment period, but before the Agency's final decision, Congress enacted the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L.No. 99-499, 100 Stat. 1613. SARA gave the EPA additional authority to regulate recycled oil without classifying it as a hazardous waste. It provides that if the EPA regulates recycled oil under 42 U.S.C. Sec. 6935(a) (i.e., UORA's section 7), state enforcement programs would apply (42 U.S.C.A. Sec. 6926(h) (West.Supp.1988)), as would the federal criminal penalties (id. at Sec. 6923(d)(4) & (7)).
 
 
 15
 The EPA then issued its final decision not to list recycled oil as a hazardous waste because the stigmatic effects of such a listing would discourage recycling. 51 Fed.Reg. 41,900 (1986). The Agency deferred decision on whether to regulate recycled oil without listing it as hazardous, and on whether to list non-recycled used oil as a hazardous waste. Id. These petitions for review followed.
 
 II. STANDING AND JURISDICTION
 
 16
 This case was brought by a number of petitioners. The Hazardous Waste Treatment Council is a trade association representing firms that treat hazardous waste. The Association of Petroleum Re-Refiners represents companies that re-refine used oils for use as lubricants and recycle used oil for other purposes. See 42 U.S.C. Sec. 6903 (39) (1982) (defining re-refining). Finally, the Natural Resources Defense Council ("NRDC") is a non-profit environmental organization, some of whose members live in communities affected by hazardous wastes. Although the EPA does not challenge petitioners' standing, the intervenors have raised the issue, and we would be obliged to consider it sua sponte. See, e.g., Bender v. Williamsport Area School Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986).
 
 
 17
 An association such as the NRDC will have standing to sue on behalf of its members when they would otherwise have standing in their own right, the interests the organization seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); see also Pennell v. City of San Jose, --- U.S. ----, 108 S.Ct. 849, 855 & n. 3, 99 L.Ed.2d 1 (1988) (reaffirming Hunt test). The first prong of the Hunt test will be satisfied if the organization shows that its members have personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision. Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).
 
 
 18
 In response to intervenors' challenge, the NRDC asserted that 5,048 of its members reside in communities in six states identified by the EPA as having experienced environmental damage and threats to human health as a result of the mismanagement of used oil. These incidents have been documented in detail by the EPA. See J.A. at 255-78. The NRDC's assertions were not refuted. In this procedural posture, the NRDC has met its burden of establishing the first prong of the Hunt test.
 
 
 19
 The NRDC's assertion that some of its members live in communities subject to incidents resulting from mismanagement of used oil is sufficient to establish injury in fact. See National Wildlife Fed'n v. Hodel, 839 F.2d 694, 707 (D.C.Cir.1988) (injury established by assertion that organization's members "live in communities" subjected to environmental degradation). True, the incidents of environmental damage documented in the EPA's study are past, and allegations of past harm are insufficient in themselves to establish standing. See, e.g., City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). But most of the incidents occurred at sites that continue to exist, J.A. at 258, and it is reasonable to infer that a recurrence of injury is "likely." See Lyons, 461 U.S. at 105, 103 S.Ct. at 1667.
 
 
 20
 These untoward consequences are fairly traceable to the EPA's failure to regulate hazardous used oil and likely to be redressed by a favorable judgment. The lack of EPA regulation made an "appreciable difference" in the prevalence of mismanagement leading to environmental damage. See Allen v. Wright, 468 U.S. 737, 758, 104 S.Ct. 3315, 3328, 82 L.Ed.2d 556 (1984). And although we do not decide whether any recycled oils meet the technical criteria for hazardousness, see below at 277, our conclusion that the Agency must reconsider its decision not to list recycled oil as hazardous is "likely" to redress the injuries alleged. See Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758. Our decision is at least a necessary first step on a path that could ultimately lead to relief fully redressing the injury.
 
 
 21
 Having adequately demonstrated that its members have standing, the NRDC must also meet the last two prongs of the Hunt test, viz., that the interests are germane to its purpose, and that the members need not participate individually. Both requirements are easily satisfied here. The interest in environmental protection is obviously pertinent to the NRDC's mission. See Humane Soc'y of the United States v. Hodel, 840 F.2d 45, 52-60 (D.C.Cir.1988) (interpreting germaneness requirement). The relief requested--an order setting aside the EPA's decision not to list recycled oil--just as obviously does not require the participation of the NRDC's members.
 
 
 22
 As the NRDC has standing, we need not consider the standing of the other organizations. E.g., Bowen v. Kendrick, --- U.S. ----, 108 S.Ct. 2562, 2580 n. 15, 101 L.Ed.2d 520 (1988).
 
 
 23
 We have jurisdiction to review the EPA's decision under 42 U.S.C. Sec. 6976(a)(1) (1982), which authorizes review under the Administrative Procedure Act ("APA"), 5 U.S.C. Secs. 701-706 (1982). The APA, in turn, authorizes judicial review of "agency action," 5 U.S.C. Sec. 702 (1982), which includes the failure to promulgate a rule. 5 U.S.C. Sec. 551(13) (1982).
 
 III. PERMISSIBILITY OF THE EPA'S DECISION
 A. Standard of Review
 
 24
 The APA directs us not to overturn an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. " 5 U.S.C. Sec. 706(2)(A) (1982) (emphasis added). The EPA explained that it determined not to list recycled oil as a hazardous waste because of its concerns about the stigmatic effects of such listing. 51 Fed.Reg. at 41,90 3. We grant the petition for review because this decision is based on a factor not allowed by the statute.
 
 
 25
 We follow a two-step inquiry in determining whether an agency's interpretation of its governing statute is contrary to law. First, we ask whether the intent of Congress is clear. Chevron U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781. We determine the plain meaning of a statute by examining, at least in the first instance, the "particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., --- U.S. ----, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). Second, if Congress has not "spoken to the precise question at issue," Chevron, 467 U.S. at 842, 104 S.Ct. at 2781, we ask whether the agency's construction of the statute is "permissible," id. at 843, 104 S.Ct. at 2782, i.e., "rational and consistent with the statute." NLRB v. United Food & Commercial Workers Union, Local 23, --- U.S. ----, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987).
 
 B. The Meaning of 42 U.S.C. Sec. 6935(b)
 
 26
 To repeat, the controlling provision states: "the Administrator shall make a final determination whether to list or identify used automobile and truck crankcase oil and other used oil as hazardous wastes under section 6921...." 42 U.S.C. Sec. 6935(b) (emphasis added). Viewing the "particular statutory language at issue" in isolation, K Mart, 108 S.Ct. at 1817, this provision requires the EPA to determine whether used oil meets the criteria for hazardous waste specified in 42 U.S.C. Sec. 6921. Although "under" has a number of meanings, the only ones that could have been intended in the present context are "required by: in accordance with: bound by." Webster's Third New International Dictionary 2487 (1981) (definition 8a); accord Sondeno v. Union Commerce Bank, 71 Cal.App.3d 391, 396, 139 Cal.Rptr. 229, 232 (1977) (similarly interpreting statute referring to bank "operating under" the Bank Act).
 
 
 27
 The Second Circuit recently interpreted "under" in a similar manner. In Asbestec Construction Services, Inc. v. EPA, 849 F.2d 765 (2d Cir.1988), the EPA issued a compliance order against Asbestec for violations of the Clean Air Act. The order was issued pursuant to 42 U.S.C. Sec. 7413(a) (3) (1982), which authorizes such orders when the EPA finds that a person has violated 42 U.S.C. Sec. 7412(c). Asbestec sought review under 42 U.S.C. Sec. 7607(b)(1), which grants jurisdiction to the courts of appeals over any order "under section 7412(c)." The court dismissed the petition for lack of jurisdiction:
 
 
 28
 Congress' use of the term "under section 7412(c)" indicates that it envisioned only orders issued pursuant to authority granted in Sec. 7412(c)--that is, "under" Sec. 7412(c)--to be reviewable. In contrast, the order at issue here was issued pursuant to, or "under," Sec. 7413(a)(3). Consequently, we agree with the EPA that the compliance order issued against Asbestec is not reviewable as an order "under section 7412(c)."
 
 
 29
 At 768 (emphasis original).
 
 
 30
 Section 6921 and the regulations adopted thereunder refer only to the technical characteristics of hazardous wastes; they do not mention "stigma." Examined alone, therefore, section 6935(b) forecloses the EPA's decision, as it requires the EPA to determine whether to list used oil under (i.e., according to the criteria specified in) section 6921.
 
 
 31
 We now turn to "the language and design of the statute as a whole." K Mart, 108 S.Ct. at 1817. The EPA attempts to salvage its decision by invoking section 8 of the UORA. As explained above at 4-5, that section required the EPA to determine the applicability to used oil of the regulatory criteria for the characteristics of hazardous wastes and to report that determination to Congress by a specified date. In making that determination ("under paragraph (1)"), the Agency was directed to "ensure that the recovery and reuse of used oil are not discouraged." 94 Stat. at 2058. Section 8 required the EPA to make a single determination and to report that single determination to Congress. Once the Agency had fulfilled that obligation by submitting its report to Congress on January 16, 1981, section 8 had served its purpose and was without further effect. A fortiori, its proviso, which applied solely to the Agency's initial determination, died along with the rest of section 8.
 
 
 32
 The EPA's final attempt to demonstrate a statutory ambiguity draws on the statute's unique treatment of recycled oil. Section 7 of the UORA, codified as amended at 42 U.S.C. Sec. 6935(a), authorizes the EPA to regulate recycled oil (but not other used oil) without listing it as a hazardous waste. Reading sections 6935(a) and (b) in pari materia, the EPA argues that Congress intended to give the Agency a choice when dealing with recycled oil: to regulate it without listing it as a hazardous waste ("track 1"), or to regulate it with such a listing ("track 2"). The EPA asserts, essentially, that its regulatory authority is identical under the two tracks. Section 6935(c) and (d), however, authorize the Agency to ease the restrictions otherwise applicable to hazardous waste in order not to discourage recycling. The only difference between tracks 1 and 2 is that the EPA calls a recycled oil "hazardous" under track 2. See 51 Fed.Reg. at 41,901.
 
 
 33
 The Agency maintains that Congress intended to permit it to determine whether such an appellation would serve the general aim of the Act, to promote environmental protection. Thus, when section 6935(b) speaks of a decision "under section 6921," it merely means that the EPA must decide whether to regulate a particular recycled oil under section 6935(a), in which case it will not list it as a hazardous waste, or to regulate it under section 6921, in which case it will. The reference in section 6935(b) to section 6921 is only a shorthand method of distinguishing track 1 from track 2.
 
 
 34
 Although superficially appealing, this structural argument ultimately fails. We base this conclusion on the historical development of the statutory scheme and the different consequences that Congress attached to regulation under track 2 rather than track 1.
 
 
 35
 First, the EPA's interpretation is implausible in view of the statute's historical development. When it first dealt with the problem, Congress directed the EPA to consider whether a determination that used oil was hazardous would discourage recovery and reuse. UORA Sec. 8, 94 Stat. at 2058. As we have noted, that direction expired when the EPA fulfilled its obligation under section 8 by delivering its report to Congress. When Congress acted again in 1984, it carefully separated the listing decision from the resultant regulatory decisions. With respect to the former, section 6935(b) simply requires the Agency to determine whether to list used oil as hazardous under section 6921. Only after the EPA decides to list does the statute permit it to consider the effect of its regulations on recycling. See id. at Sec. 6935(c)(2)(A).
 
 
 36
 Congress' inclusion of the effect on recycling in section 8 of the 1980 statute, combined with its omission of that factor in section 6935(b) and its inclusion only in section 6935(c), demonstrates that Congress intended the EPA to consider that factor only when adopting regulations for hazardous recycled oil, not in determining whether to list it as hazardous. When a statutory provision is deleted in a subsequent reenactment, the omitted term cannot be read into the later statute. Chertkof v. United States, 676 F.2d 984, 987-88 (4th Cir.1982); 2A N. Singer Sutherland Statutory Construction Sec. 51.02, at 454 (Sands 4th ed. 1984).
 
 
 37
 Second, the EPA's interpretation overlooks the different consequences perceived by Congress between regulation under track 2 rather than track 1. The Agency's interpretation assumes that the Congress that adopted section 6935(b) understood the EPA to have the same authority under track 1 as it did under track 2. Otherwise, it is completely implausible to interpret section 6935(b) as merely specifying an alternative (and equivalent) mode of regulation to section 6935(a).
 
 
 38
 Accordingly, we must determine the understanding of the Congress that enacted section 6935(b). See, e.g., United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962) ("statutes are construed by the courts with reference to the circumstances existing at the time of the passage"). The 1984 Congress did not view section 6935(b) (track 2) as interchangeable with section 6935(a) (track 1) with respect to recycled oil.
 
 
 39
 For example, track 2 gives the Agency more specific guidance for regulation than that contained in track 1. Under track 1, which was enacted in 1980, the EPA is merely authorized to regulate "as may be necessary to protect the public health and the environment." 42 U.S.C. Sec. 6935(a). Track 2 was enacted in part to modify this regime. If the Agency lists recycled oils under section 6935(b), it is guided in how to regulate those oils by sections 6935(c)-(d). Congress adopted track 2 to provide the EPA with "more detailed direction" as to how to regulate than was contained in track 1. H.Conf.Rep. 1133, 98th Cong., 2d Sess. 113 (1984).
 
 
 40
 Another instance of Congress' understanding of the different consequences between regulation under tracks 1 and 2 relates to regulatory enforcement. At the time track 2 was adopted, section 6935(a) authorized neither state participation in enforcement nor criminal penalties, both of which were available under track 2. Although this authority was added to track 1 in 1986 by SARA, that later enactment does not affect our interpretation of the intent of the 1984 Congress that adopted track 2. See also H.Conf.Rep. 962, 99th Cong., 2d Sess. 227 (1986) (amendments not intended to affect regulation under section 6935(b)).
 
 
 41
 A final example of the differences between regulation under tracks 1 and 2 concerns certain tax consequences. An Agency decision to regulate recycled oil under track 2 by listing it as hazardous under section 6935(b) would have triggered an excise tax of $2.13 per dry weight ton. See 26 U.S.C. Secs. 4681-82 (1982), repealed, SARA Sec. 514(a)(1), 100 Stat. at 1767 (1986). No such tax consequences would have resulted from regulation under track 1. The subsequent repeal of the tax for reasons unrelated to the differences between tracks 1 and 2 has no bearing on our conclusion that the 1984 Congress understood regulation under the two tracks to have substantially different consequences.
 
 
 42
 In short, the language of section 6935(b) requires the EPA to determine whether used oil meets the technical criteria for listing as hazardous, and the structure of the statute does not indicate that Congress had a different intention with respect to recycled oil. As the statute clearly defines the Agency's obligation, "that is the end of the matter." Chevron, 467 U.S. at 842, 104 S.Ct. at 2781.
 
 
 43
 The EPA nevertheless argues that its action is justified as a means of furthering the general purpose of the Act, to promote environmental protection. Reference to these general purposes, however, cannot override the intent of Congress clearly expressed in the language and structure of the statute. "Application of 'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action." Board of Gov. v. Dimension Financial Corp., 474 U.S. 361, 373-74, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986). Cf. Continental Air Lines, Inc. v. DOT, 843 F.2d 1444, 1450-53 (D.C.Cir.1988) (deference to agency's accommodation of broad congressional purposes when statute is ambiguous).
 
 
 44
 The EPA's concern over the possible adverse environmental consequences of listing the used oil may well be warranted. See Katzman, From Horse Carts to Minimills, 92 The Public Interest 121, 132 (Summer 1988) ("when the EPA threatened to recognize waste oil from dismantled cars as hazardous, the highly efficient waste-oil refining industry simply closed its doors until the threat disappeared. Obviously, these rejected materials do not simply evaporate; they may merely be disposed of surreptitiously."). Nevertheless, it is the Agency's obligation to comply with the dictates of Congress, and ours to enforce them.
 
 C. Relief
 
 45
 We hold only that the EPA acted contrary to law in basing its determination under section 6935(b) on the stigmatic effects of listing. The EPA must now determine whether any recycled oils meet the technical criteria for listing specified in section 6921 and the regulations promulgated thereunder. Although the Agency previously indicated its tentative view that certain recycled oils met those technical criteria, and petitioners argue that we should order the EPA to list, the EPA has not yet made a final technical determination, which is its responsibility in the first instance. Similarly, we reject petitioners' request for an order requiring promulgation of management standards under sections 6935(c) and (d). That claim is premature until the Agency decides to list recycled oils as hazardous.
 
 IV. CONCLUSION
 
 46
 The EPA erroneously based its decision not to list recycled oils as hazardous wastes on the stigmatic effects of such a listing, a factor not permitted by the statute. The Agency must determine whether any recycled oils meet the technical criteria for listing. To this extent only, the petitions for review are
 
 
 47
 GRANTED.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 293(a)