# HUNT, GOVERNOR OF NORTH CAROLINA, ET AL. *v.* WASHINGTON STATE APPLE ADVERTISING COMMISSION

No. 76–63.  Argued February 22, 1977—Decided June 20, 1977

BURGER, C. J., delivered the opinion of the Court, in which all Members joined except REHNQUIST, J., who took no part in the consideration or decision of the case.

*John R. Jordan, Jr.,* argued the cause for appellants. With him on the brief were *Rufus L. Edmisten,* Attorney General of North Carolina, and *Millard R. Rich, Jr.,* Deputy Attorney General.

*Slade Gorton,* Attorney General of Washington, argued the cause for appellee. With him on the brief were *Edward B. Mackie,* Deputy Attorney General, and *James Arneil,* Special Assistant Attorney General.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

In 1973, North Carolina enacted a statute which required, *inter alia,* all closed containers of apples sold, offered for sale, or shipped into the State to bear "no grade other than the applicable U. S. grade or standard." N. C. Gen. Stat. § 106–189.1 (1973). In an action brought by the Washington State Apple Advertising Commission, a three-judge Federal District Court invalidated the statute insofar as it prohibited the display of Washington State apple grades on the ground that it unconstitutionally discriminated against interstate commerce.

The specific questions presented on appeal are (a) whether the Commission had standing to bring this action; (b) if so, whether it satisfied the jurisdictional-amount requirement of 28 U. S. C. § 1331;[1] and (c) whether the challenged North Carolina statute constitutes an unconstitutional burden on interstate commerce.

(1)

Washington State is the Nation's largest producer of apples, its crops accounting for approximately 30% of all apples grown domestically and nearly half of all apples shipped in closed containers in interstate commerce. As might be expected, the production and sale of apples on this scale is a multimillion dollar enterprise which plays a significant role in Washington's economy. Because of the importance of the apple industry to the State, its legislature has undertaken to protect and enhance the reputation of Washington apples by establishing a stringent, mandatory inspection program, administered by the State's Department of Agriculture, which requires all apples shipped in interstate commerce to be tested under strict quality standards and graded accordingly. In all cases, the Washington State grades, which have gained substantial acceptance in the trade, are the equivalent of, or superior to, the comparable grades and standards adopted by the United States Department of Agriculture (USDA). Compliance with the Washington inspection scheme costs the State's growers approximately $1 million each year.

In addition to the inspection program, the state legislature has sought to enhance the market for Washington apples through the creation of a state agency, the Washington State Apple Advertising Commission, charged with the statutory

---

[1] Section 1331 provides in pertinent part:

"(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs . . . ."

duty of promoting and protecting the State's apple industry. The Commission itself is composed of 13 Washington apple growers and dealers who are nominated and elected within electoral districts by their fellow growers and dealers. Wash. Rev. Code §§ 15.24.020, 15.24.030 (1974). Among its activities are the promotion of Washington apples in both domestic and foreign markets through advertising, market research and analysis, and public education, as well as scientific research into the uses, development, and improvement of apples. Its activities are financed entirely by assessments levied upon the apple industry, § 15.24.100; in the year during which this litigation began, these assessments totaled approximately $1.75 million. The assessments, while initially fixed by statute, can be increased only upon the majority vote of the apple growers themselves. § 15.24.090.

In 1972, the North Carolina Board of Agriculture adopted an administrative regulation, unique in the 50 States, which in effect required all closed containers of apples shipped into or sold in the State to display either the applicable USDA grade or a notice indicating no classification. State grades were expressly prohibited.[2] In addition to its obvious consequence—prohibiting the display of Washington State apple grades on containers of apples shipped into North Carolina, the regulation presented the Washington apple industry with a marketing problem of potentially nationwide significance. Washington apple growers annually ship in commerce approximately 40 million closed containers of apples, nearly 500,000 of which eventually find their way into North Carolina, stamped with the applicable Washington State variety

---

[2] The North Carolina regulation, as amended, provides in pertinent part: "(6) Apple containers must show the applicable U. S. Grade on the principal display panel or marked 'Unclassified,' 'Not Graded,' or 'Grade Not Determined.' State grades shall not be shown." § 3–24.5 (6), Rules, Regulations, Definitions and Standards of the North Carolina Department of Agriculture.

and grade. It is the industry's practice to purchase these containers preprinted with the various apple varieties and grades, prior to harvest. After these containers are filled with apples of the appropriate type and grade, a substantial portion of them are placed in cold-storage warehouses where the grade labels identify the product and facilitate its handling. These apples are then shipped as needed throughout the year; after February 1 of each year, they constitute approximately two-thirds of all apples sold in fresh markets in this country. Since the ultimate destination of these apples is unknown at the time they are placed in storage, compliance with North Carolina's unique regulation would have required Washington growers to obliterate the printed labels on containers shipped to North Carolina, thus giving their product a damaged appearance. Alternatively, they could have changed their marketing practices to accommodate the needs of the North Carolina market, i. e., repack apples to be shipped to North Carolina in containers bearing only the USDA grade, and/or store the estimated portion of the harvest destined for that market in such special containers. As a last resort, they could discontinue the use of the preprinted containers entirely. None of these costly and less efficient options was very attractive to the industry. Moreover, in the event a number of other States followed North Carolina's lead, the resultant inability to display the Washington grades could force the Washington growers to abandon the State's expensive inspection and grading system which their customers had come to know and rely on over the 60-odd years of its existence.

With these problems confronting the industry, the Washington State Apple Advertising Commission petitioned the North Carolina Board of Agriculture to amend its regulation to permit the display of state grades. An administrative hearing was held on the question but no relief was granted.

Indeed, North Carolina hardened its position shortly there-
after by enacting the regulation into law:

"All apples sold, offered for sale or shipped into this State
in closed containers shall bear on the container, bag or
other receptacle, no grade other than the applicable U. S.
grade or standard or the marking 'unclassified,' 'not
graded' or 'grade not determined.'" N. C. Gen. Stat.
§ 106–189.1 (1973).

Nonetheless, the Commission once again requested an exemp-
tion which would have permitted the Washington apple grow-
ers to display both the United States and the Washington
State grades on their shipments to North Carolina. This
request, too, was denied.

Unsuccessful in its attempts to secure administrative relief,
the Commission [3] instituted this action challenging the con-
stitutionality of the statute in the United States District
Court for the Eastern District of North Carolina. Its com-
plaint, which invoked the District Court's jurisdiction under
28 U. S. C. §§ 1331 and 1343, sought a declaration that the
statute violated, *inter alia,* the Commerce Clause of the
United States Constitution, Art. I, § 8, cl. 3, insofar as it
prohibited the display of Washington State grades, and
prayed for a permanent injunction against its enforcement in
this manner. A three-judge Federal District Court was con-
vened pursuant to 28 U. S. C. §§ 2281 and 2284 to consider
the Commission's constitutional attack on the statute.

After a hearing, the District Court granted the requested
relief. 408 F. Supp. 857 (1976). At the outset, it held that
the Commission had standing to challenge the statute both in
its own right and on behalf of the Washington State growers
and dealers, and that the $10,000 amount-in-controversy

---

[3] Under Washington law, the Commission is a corporation and is
specifically granted the power to sue and be sued. Wash. Rev. Code
§ 15.24.070 (8) (1974).

requirement of § 1331 had been satisfied.[4]   408 F. Supp., at 858.
Proceeding to the merits, the District Court found that the
North Carolina statute, while neutral on its face, actually dis-
criminated against Washington State growers and dealers in
favor of their local counterparts.   *Id.*, at 860–861.   This dis-
crimination resulted from the fact that North Carolina, unlike
Washington, had never established a grading and inspection
system.   Hence, the statute had no effect on the existing
practices of North Carolina producers; they were still free to
use the USDA grade or none at all.   Washington growers and
dealers, on the other hand, were forced to alter their long-
established procedures, at substantial cost, or abandon the
North Carolina market.   The District Court then concluded
that this discrimination against out-of-state competitors was
not justified by the asserted local interest—the elimination of
deception and confusion from the marketplace—arguably fur-
thered by the statute.   Indeed, it noted that the statute was
"irrationally" drawn to accomplish that alleged goal since it
permitted the marketing of closed containers of apples with-
out any grade at all.   *Id.*, at 861–862.   The court therefore
held that the statute unconstitutionally discriminated against
commerce, insofar as it affected the interstate shipment of
Washington apples,[5] and enjoined its application.   This
appeal followed and we postponed further consideration of the
question of jurisdiction to the hearing of the case on the

---

[4] In this regard, it adopted the ruling of the single District Judge who
had previously denied appellants' motion to dismiss the complaint brought
on the same grounds.   App. 51–58.   That judge had found it unnecessary
to determine whether jurisdiction was also proper under 28 U. S. C. § 1343
in view of his determination that jurisdiction had been established under
§ 1331.   App. 57 n. 2.

[5] As an alternative ground for its holding, the District Court found that
the statute would have constituted an undue burden on commerce even if
it had been neutral and nondiscriminatory in its impact.   *Pike* v. *Bruce
Church, Inc.*, 397 U. S. 137 (1970).   408 F. Supp., at 862 n. 9.

merits *sub nom. Holshouser* v. *Washington State Apple Advertising Comm'n,* 429 U. S. 814 (1976).

(2)

In this Court, as before, the North Carolina officials vigorously contest the Washington Commission's standing to prosecute this action, either in its own right, or on behalf of that State's apple industry which it purports to represent. At the outset, appellants maintain that the Commission lacks the "personal stake" in the outcome of this litigation essential to its invocation of federal-court jurisdiction. *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). The Commission, they point out, is a state agency, not itself engaged in the production and sale of Washington apples or their shipment into North Carolina. Rather, its North Carolina activities are limited to the promotion of Washington apples in that market through advertising.[6] Appellants contend that the challenged statute has no impact on that activity since it prohibits only the display of state apple grades on closed containers of apples. Indeed, since the statute imposed no restrictions on the advertisement of Washington apples or grades other than the labeling ban, which affects only those parties actually engaged in the apple trade, the Commission is said to be free to carry on the same activities that it engaged in prior to the regulatory program. Appellants therefore argue that the Commission suffers no injury, economic or otherwise, from the statute's operation, and, as a result, cannot make out the "case or controversy" between itself and the appellants needed to establish standing in the constitutional sense. *E. g., Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 260–264 (1977); *Warth* v. *Seldin,* 422 U. S. 490, 498–499 (1975).

Moreover, appellants assert, the Commission cannot rely on

---

[6] During 1974, the Commission spent in excess of $25,000 advertising Washington apples in the North Carolina market. *Id.,* at 859.

the injuries which the statute allegedly inflicts individually or collectively on Washington apple growers and dealers in order to confer standing on itself. Those growers and dealers, appellants argue, are under no disabilities which prevent them from coming forward to protect their own rights if they are, in fact, injured by the statute's operation. In any event, appellants contend that the Commission is not a proper representative of industry interests. Although this Court has recognized that an association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity, *e. g., Warth* v. *Seldin, supra,* at 511; *National Motor Freight Assn.* v. *United States,* 372 U. S. 246 (1963), the Commission is not a traditional voluntary membership organization such as a trade association, for it has no members at all. Thus, since the Commission has no members whose claims it might raise, and since it has suffered no "distinct and palpable injury" to itself, it can assert no more than an abstract concern for the well-being of the Washington apple industry as the basis for its standing. That type of interest, appellants argue, cannot "substitute for the concrete injury required by Art. III." *Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U. S. 26, 40 (1976).

If the Commission were a voluntary membership organization—a typical trade association—its standing to bring this action as the representative of its constituents would be clear under prior decisions of this Court. In *Warth* v. *Seldin, supra,* we stated:

> "Even in the absence of injury to itself, an association may have standing solely as the representative of its members. . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . . So long as this can be established, and so long as the nature of the claim and

of the relief sought does not make the individual partici-
pation of each injured party indispensable to proper
resolution of the cause, the association may be an appro-
priate representative of its members, entitled to invoke
the court's jurisdiction." 422 U. S., at 511.

See also *Simon* v. *Eastern Ky. Welfare Rights Org., supra,*
at 39–40; *Meek* v. *Pittenger,* 421 U. S. 349, 355–356, n. 5
(1975); *Sierra Club* v. *Morton,* 405 U. S. 727, 739 (1972);
*National Motor Freight Assn.* v. *United States, supra.* We
went on in *Warth* to elaborate on the type of relief that an
association could properly pursue on behalf of its members:

"[W]hether an association has standing to invoke the
court's remedial powers on behalf of its members depends
in substantial measure on the nature of the relief sought.
If in a proper case the association seeks a declaration,
injunction, or some other form of prospective relief, it can
reasonably be supposed that the remedy, if granted, will
inure to the benefit of those members of the association
actually injured. Indeed, in all cases in which we have
expressly recognized standing in associations to represent
their members, the relief sought has been of this kind."
422 U. S., at 515.

Thus we have recognized that an association has standing to
bring suit on behalf of its members when: (a) its members
would otherwise have standing to sue in their own right;
(b) the interests it seeks to protect are germane to the organi-
zation's purpose; and (c) neither the claim asserted nor the
relief requested requires the participation of individual mem-
bers in the lawsuit.

The prerequisites to "associational standing" described in
*Warth* are clearly present here. The Commission's complaint
alleged, and the District Court found as a fact, that the North
Carolina statute had caused some Washington apple growers
and dealers (a) to obliterate Washington State grades from the

large volume of closed containers destined for the North Carolina market at a cost ranging from 5 to 15 cents per carton; (b) to abandon the use of preprinted containers, thus diminishing the efficiency of their marketing operations; or (c) to lose accounts in North Carolina. Such injuries are direct and sufficient to establish the requisite "case or controversy" between Washington apple producers and appellants. Moreover, the Commission's attempt to remedy these injuries and to secure the industry's right to publicize its grading system is central to the Commission's purpose of protecting and enhancing the market for Washington apples. Finally, neither the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context.

The only question presented, therefore, is whether, on this record, the Commission's status as a state agency, rather than a traditional voluntary membership organization, precludes it from asserting the claims of the Washington apple growers and dealers who form its constituency. We think not. The Commission, while admittedly a state agency, for all practical purposes performs the functions of a traditional trade association representing the Washington apple industry. As previously noted, its purpose is the protection and promotion of the Washington apple industry; and, in the pursuit of that end, it has engaged in advertising, market research and analysis, public education campaigns, and scientific research. It thus serves a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation.

Moreover, while the apple growers and dealers are not "members" of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit,

through assessments levied upon them. In a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests. Nor do we find it significant in determining whether the Commission may properly represent its constituency that "membership" is "compelled" in the form of mandatory assessments. Membership in a union, or its equivalent, is often required. Likewise, membership in a bar association, which may also be an agency of the State, is often a prerequisite to the practice of law. Yet in neither instance would it be reasonable to suggest that such an organization lacked standing to assert the claims of its constituents.

Finally, we note that the interests of the Commission itself may be adversely affected by the outcome of this litigation. The annual assessments paid to the Commission are tied to the volume of apples grown and packaged as "Washington Apples." In the event the North Carolina statute results in a contraction of the market for Washington apples or prevents any market expansion that might otherwise occur, it could reduce the amount of the assessments due the Commission and used to support its activities. This financial nexus between the interests of the Commission and its constituents coalesces with the other factors noted above to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker* v. *Carr,* 369 U. S., at 204; see also *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 459–460 (1958).

Under the circumstances presented here, it would exalt form over substance to differentiate between the Washington Commission and a traditional trade association representing the individual growers and dealers who collectively form its constituency. We therefore agree with the District Court that the Commission has standing to bring this action in a representational capacity.

## (3)

We turn next to the appellants' claim that the Commission has failed to satisfy the $10,000 amount-in-controversy requirement of 28 U. S. C. § 1331. As to this, the appellants maintain that the Commission itself has not demonstrated that its right to be free of the restrictions imposed by the challenged statute is worth more than the requisite $10,000. Indeed, they argue that the Commission has made no real effort to do so, but has instead attempted to rely on the actual and threatened injury to the individual Washington apple growers and dealers upon whom the statute has a direct impact. This, they claim, it cannot do, for those growers and dealers are not parties to this litigation. Alternatively, appellants argue that even if the Commission can properly rely on the claims of the individual growers and dealers, it cannot establish the required jurisdictional amount without aggregating those claims. Such aggregation, they argue, is impermissible under this Court's decisions in *Snyder* v. *Harris*, 394 U. S. 332 (1969), and *Zahn* v. *International Paper Co.*, 414 U. S. 291 (1973).

Our determination that the Commission has standing to assert the rights of the individual growers and dealers in a representational capacity disposes of the appellants' first contention. Obviously, if the Commission has standing to litigate the claims of its constituents, it may also rely on them to meet the requisite amount in controversy. Hence, we proceed to the question of whether those claims were sufficient to confer subject-matter jurisdiction on the District Court. In resolving this issue, we have found it unnecessary to reach the aggregation question posed by the appellants for it does not appear to us "to a legal certainty" that the claims of at least some of the individual growers and dealers will not amount to the required $10,000. *St. Paul Mercury Indemnity Co.* v. *Red Cab Co.*, 303 U. S. 283, 288–289 (1938).

In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation. *E. g., McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 181 (1936); *Glenwood Light & Water Co.* v. *Mutual Light, Heat & Power Co.*, 239 U. S. 121, 126 (1915); *Hunt* v. *New York Cotton Exchange*, 205 U. S. 322, 336 (1907); 1 J. Moore, Federal Practice ¶¶ 0.95, 0.96 (2d ed. 1975); C. Wright, A Miller, & E. Cooper, Federal Practice & Procedure § 3708 (1976). Here, that object is the right of the individual Washington apple growers and dealers to conduct their business affairs in the North Carolina market free from the interference of the challenged statute. The value of that right is measured by the losses that will follow from the statute's enforcement. *McNutt, supra,* at 181; *Buck* v. *Gallagher*, 307 U. S. 95, 100 (1939); *Kroger Grocery & Baking Co.* v. *Lutz*, 299 U. S. 300, 301 (1936); *Packard* v. *Banton*, 264 U. S. 140, 142 (1924).

Here the record demonstrates that the growers and dealers have suffered and will continue to suffer losses of various types. For example, there is evidence supporting the District Court's finding that individual growers and shippers lost accounts in North Carolina as a direct result of the statute. Obviously, those lost sales could lead to diminished profits. There is also evidence to support the finding that individual growers and dealers incurred substantial costs in complying with the statute. As previously noted, the statute caused some growers and dealers to manually obliterate the Washington grades from closed containers to be shipped to North Carolina at a cost of from 5 to 15 cents per carton. Other dealers decided to alter their marketing practices, not without cost, by repacking apples or abandoning the use of preprinted containers entirely, among other things. Such costs of compliance are properly considered in computing the amount in controversy. *Buck* v. *Gallagher, supra; Packard* v. *Banton, supra; Allway Taxi, Inc.* v. *New York*, 340 F. Supp. 1120

(SDNY), aff'd, 468 F. 2d 624 (CA2 1972). In addition, the statute deprived the growers and dealers of their rights to utilize most effectively the Washington State grades which, the record demonstrates, were of long standing and had gained wide acceptance in the trade. The competitive advantages thus lost could not be regained without incurring additional costs in the form of advertising, etc. Cf. *Spock* v. *David*, 502 F. 2d 953, 956 (CA3 1974), rev'd on other grounds, 424 U. S. 828 (1976). Moreover, since many apples eventually shipped to North Carolina will have already gone through the expensive inspection and grading procedure, the challenged statute will have the additional effect of causing growers and dealers to incur inspection costs unnecessarily.

Both the substantial volume of sales in North Carolina— the record demonstrates that in 1974 alone, such sales were in excess of $2 million [7]—and the continuing nature of the statute's interference with the business affairs of the Commission's constituents, preclude our saying "to a legal certainty," on this record, that such losses and expenses will not, over time, if they have not done so already, amount to the requisite $10,000 for at least some of the individual growers and dealers. That is sufficient to sustain the District Court's jurisdiction. The requirements of § 1331 are therefore met.

### (4)

We turn finally to the appellants' claim that the District Court erred in holding that the North Carolina statute violated the Commerce Clause insofar as it prohibited the display of Washington State grades on closed containers of apples shipped into the State. Appellants do not really contest the District Court's determination that the challenged statute burdened the Washington apple industry by increasing its

---

[7] In addition, apples worth approximately 30 to 40 percent of that amount were transshipped into North Carolina in 1974 after direct shipment to apple brokers and wholesalers located in other States.

costs of doing business in the North Carolina market and causing it to lose accounts there. Rather, they maintain that any such burdens on the interstate sale of Washington apples were far outweighed by the local benefits flowing from what they contend was a valid exercise of North Carolina's inherent police powers designed to protect its citizenry from fraud and deception in the marketing of apples.

Prior to the statute's enactment, appellants point out, apples from 13 different States were shipped into North Carolina for sale. Seven of those States, including the State of Washington, had their own grading systems which, while differing in their standards, used similar descriptive labels (e. g., fancy, extra fancy, etc.). This multiplicity of inconsistent state grades, as the District Court itself found, posed dangers of deception and confusion not only in the North Carolina market, but in the Nation as a whole. The North Carolina statute, appellants claim, was enacted to eliminate this source of deception and confusion by replacing the numerous state grades with a single uniform standard. Moreover, it is contended that North Carolina sought to accomplish this goal of uniformity in an evenhanded manner as evidenced by the fact that its statute applies to all apples sold in closed containers in the State without regard to their point of origin. Nonetheless, appellants argue that the District Court gave "scant attention" to the obvious benefits flowing from the challenged legislation and to the long line of decisions from this Court holding that the States possess "broad powers" to protect local purchasers from fraud and deception in the marketing of foodstuffs. *E. g., Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132 (1963); *Pacific States Box & Basket Co.* v. *White,* 296 U. S. 176 (1935); *Corn Products Refining Co.* v. *Eddy,* 249 U. S. 427 (1919).

As the appellants properly point out, not every exercise of state authority imposing some burden on the free flow of commerce is invalid. *E. g., Great Atlantic & Pacific Tea Co.*

v. *Cottrell,* 424 U. S. 366, 371 (1976); *Freeman* v. *Hewit,* 329 U. S. 249, 252 (1946). Although the Commerce Clause acts as a limitation upon state power even without congressional implementation, *e. g., Great Atlantic & Pacific Tea Co., supra,* at 370–371; *Freeman* v. *Hewit, supra,* at 252; *Cooley* v. *Board of Wardens,* 12 How. 299 (1852), our opinions have long recognized that,

> "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 767 (1945).

Moreover, as appellants correctly note, that "residuum" is particularly strong when the State acts to protect its citizenry in matters pertaining to the sale of foodstuffs. *Florida Lime & Avocado Growers, Inc., supra,* at 146. By the same token, however, a finding that state legislation furthers matters of legitimate local concern, even in the health and consumer protection areas, does not end the inquiry. Such a view, we have noted, "would mean that the Commerce Clause of itself imposes no limitations on state action . . . save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 354 (1951). Rather, when such state legislation comes into conflict with the Commerce Clause's overriding requirement of a national "common market," we are confronted with the task of effecting an accommodation of the competing national and local interests. *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970); *Great Atlantic & Pacific Tea Co., supra,* at 370–372. We turn to that task.

As the District Court correctly found, the challenged statute has the practical effect of not only burdening interstate sales of Washington apples, but also discriminating against them. This discrimination takes various forms. The first, and most

obvious, is the statute's consequence of raising the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected. As previously noted, this disparate effect results from the fact that North Carolina apple producers, unlike their Washington competitors, were not forced to alter their marketing practices in order to comply with the statute. They were still free to market their wares under the USDA grade or none at all as they had done prior to the statute's enactment. Obviously, the increased costs imposed by the statute would tend to shield the local apple industry from the competition of Washington apple growers and dealers who are already at a competitive disadvantage because of their great distance from the North Carolina market.

Second, the statute has the effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned for itself through its expensive inspection and grading system. The record demonstrates that the Washington apple-grading system has gained nationwide acceptance in the apple trade. Indeed, it contains numerous affidavits from apple brokers and dealers located both inside and outside of North Carolina who state their preference, and that of their customers, for apples graded under the Washington, as opposed to the USDA, system because of the former's greater consistency, its emphasis on color, and its supporting mandatory inspections. Once again, the statute had no similar impact on the North Carolina apple industry and thus operated to its benefit.

Third, by prohibiting Washington growers and dealers from marketing apples under their State's grades, the statute has a leveling effect which insidiously operates to the advantage of local apple producers. As noted earlier, the Washington State grades are equal or superior to the USDA grades in all corresponding categories. Hence, with free market forces at

work, Washington sellers would normally enjoy a distinct market advantage vis-à-vis local producers in those categories where the Washington grade is superior. However, because of the statute's operation, Washington apples which would otherwise qualify for and be sold under the superior Washington grades will now have to be marketed under their inferior USDA counterparts. Such "downgrading" offers the North Carolina apple industry the very sort of protection against competing out-of-state products that the Commerce Clause was designed to prohibit. At worst, it will have the effect of an embargo against those Washington apples in the superior grades as Washington dealers withhold them from the North Carolina market. At best, it will deprive Washington sellers of the market premium that such apples would otherwise command.

Despite the statute's facial neutrality, the Commission suggests that its discriminatory impact on interstate commerce was not an unintended byproduct and there are some indications in the record to that effect. The most glaring is the response of the North Carolina Agriculture Commissioner to the Commission's request for an exemption following the statute's passage in which he indicated that before he could support such an exemption, he would "want to have the sentiment from our apple producers *since they were mainly responsible for this legislation being passed* . . . ." App. 21 (emphasis added). Moreover, we find it somewhat suspect that North Carolina singled out only closed containers of apples, the very means by which apples are transported in commerce, to effectuate the statute's ostensible consumer protection purpose when apples are not generally sold at retail in their shipping containers. However, we need not ascribe an economic protection motive to the North Carolina Legislature to resolve this case; we conclude that the challenged statute cannot stand insofar as it prohibits the

display of Washington State grades even if enacted for the declared purpose of protecting consumers from deception and fraud in the marketplace.

When discrimination against commerce of the type we have found is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake. *Dean Milk Co.* v. *Madison,* 340 U. S., at 354. See also *Great Atlantic & Pacific Tea Co.,* 424 U. S., at 373; *Pike* v. *Bruce Church, Inc.,* 397 U. S., at 142; *Polar Ice Cream & Creamery Co.* v. *Andrews,* 375 U. S. 361, 375 n. 9 (1964); *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 524 (1935). North Carolina has failed to sustain that burden on both scores.

The several States unquestionably possess a substantial interest in protecting their citizens from confusion and deception in the marketing of foodstuffs, but the challenged statute does remarkably little to further that laudable goal at least with respect to Washington apples and grades. The statute, as already noted, permits the marketing of closed containers of apples under *no* grades at all. Such a result can hardly be thought to eliminate the problems of deception and confusion created by the multiplicity of differing state grades; indeed, it magnifies them by depriving purchasers of all information concerning the quality of the contents of closed apple containers. Moreover, although the statute is ostensibly a consumer protection measure, it directs its primary efforts, not at the consuming public at large, but at apple wholesalers and brokers who are the principal purchasers of closed containers of apples. And those individuals are presumably the most knowledgeable individuals in this area. Since the statute does nothing at all to purify the flow of information at the retail level, it does little to protect consumers against the problems it was designed to eliminate. Finally, we note that any poten-

tial for confusion and deception created by the Washington grades [8] was not of the type that led to the statute's enactment. Since Washington grades are in all cases equal or superior to their USDA counterparts, they could only "deceive" or "confuse" a consumer to his benefit, hardly a harmful result.

In addition, it appears that nondiscriminatory alternatives to the outright ban of Washington State grades are readily available. For example, North Carolina could effectuate its goal by permitting out-of-state growers to utilize state grades only if they also marked their shipments with the applicable USDA label. In that case, the USDA grade would serve as a benchmark against which the consumer could evaluate the quality of the various state grades. If this alternative was for some reason inadequate to eradicate problems caused by state grades inferior to those adopted by the USDA, North Carolina might consider banning those state grades which, unlike Washington's, could not be demonstrated to be equal or superior to the corresponding USDA categories. Concededly, even in this latter instance, some potential for "confusion" might persist. However, it is the type of "confusion" that the national interest in the free flow of goods between the States demands be tolerated. [9]

The judgment of the District Court is

*Affirmed.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of the case.

---

[8] Indeed, the District Court specifically indicated in its findings of fact that there had been no showing that the Washington State grades had caused any confusion in the North Carolina market. 408 F. Supp., at 859.

[9] Our conclusion in this regard necessarily rejects North Carolina's suggestion that the burdens on commerce imposed by the statute are justified on the ground that the standardization required by the statute serves the national interest in achieving uniformity in the grading and labeling of foodstuffs.