602 So.2d 632 (1992)
DRAVO BASIC MATERIALS COMPANY, INC., Appellant,
v.
STATE of Florida, DEPARTMENT OF TRANSPORTATION, Appellee.
No. 91-03012.
District Court of Appeal of Florida, Second District.
July 8, 1992.
Rehearing Denied August 5, 1992.
Stanley H. Eleff and Robert D. Sanchez of Trenam, Simmons, Kemker, Scharf, Barkin, *633 Frye & O'Neill, P.A., Tampa, for appellant.
Thornton J. Williams, General Counsel, and Gregory G. Costas, Asst. General Counsel, Florida Dept. of Transp., Tallahassee, for appellee.
ALTENBERND, Judge.
Dravo Basic Materials Company, Inc. (Dravo), appeals a hearing officer's determination in a rule-challenge proceeding brought pursuant to section 120.54(4), Florida Statutes (1989). At the administrative hearing, Dravo argued that a proposed Department of Transportation (DOT) rule governing the quality of limestone aggregate used in road construction was arbitrary and capricious. The hearing officer upheld the validity of the proposed rule. In light of this court's limited scope of review and Dravo's difficult burden of proof before the hearing officer, we must affirm the challenged order. See Adam Smith Enters., Inc. v. Department of Envtl. Reg., 553 So.2d 1260 (Fla. 1st DCA 1989); Agrico Chem. Co. v. Department of Envtl. Reg., 365 So.2d 759 (Fla. 1st DCA 1978), cert. denied sub nom. Askew v. Agrico Chem. Co., 376 So.2d 74 (Fla. 1979).
Dravo operates a limestone mine in the Bahamas. It imports high quality limestone aggregate to redistribution terminals in Tampa and Jacksonville, Florida. Dravo has sold limestone aggregate to DOT in the past for use in road construction and wishes to do so in the future.
For many years, DOT has restricted the percentage of fine material in limestone aggregate used for road construction.[1] There is no dispute between Dravo and DOT that an excessive amount of fine material in limestone aggregate is unacceptable for road construction. Longstanding DOT specifications required that limestone aggregate have 3.75% or less fine material at its point of use. In 1988, these specifications were held invalid because they had not been promulgated as rules under the procedures set out in section 120.54, Florida Statutes (1987). Department of Transp. v. Blackhawk Quarry Co. of Florida, Inc., 528 So.2d 447 (Fla. 5th DCA 1988).
DOT proposed new rules to replace the specifications invalidated in Blackhawk. The proposed rules are similar in many respects to the old specifications and provide similar methods to test and assure product quality under those specifications. Limestone aggregate is still required to meet the 3.75% standard at the point of use. DOT has proposed a relatively complex testing and quality assurance program to insure that its limestone suppliers meet that standard. The complexity of this program is a consequence, at least in part, of the nature of limestone and the location of the suppliers' mines.
It is undisputed that limestone aggregate breaks down when handled. As a result, the percentage of fine material present in limestone aggregate increases in rough relationship to the extent that the limestone is moved or handled. Thus, DOT is legitimately concerned that limestone delivered from more distant mines will contain more fine material than that delivered from nearby mines.
Moreover, for many practical and economic reasons, DOT wishes to avoid inspecting each truckload of limestone at the point of use. Thus, it has developed a program to test limestone aggregate at the mine or at redistribution terminals. Since DOT anticipates that the limestone will further degrade when it is transported from the mine or redistribution terminal to the point of use, the limestone must meet a more stringent test at those points. The limestone must not exceed 1.75% fine material at the mine or at the redistribution terminal.
The proposed rules classify limestone mines into three "types," depending upon their location. Type I mines are mines which are located either in Florida or within a four-hour drive of a DOT district materials *634 office. Type II mines are out-of-state mines more than four hours from, but within an overnight drive (eight hours) of, such an office. Type III mines are out-of-state or international mines which cannot be reached by an overnight drive. Although other Type III mines may wish to compete in Florida in the future, it is undisputed that Dravo is currently the only Type III mine seeking approval from DOT.
The three mine classifications were created primarily to control the cost of state inspection. DOT has logically concluded that it is easier and more economical to conduct on-site inspections of limestone at mines that are in or near Florida. It has therefore devised different inspection and testing procedures for each of the three types of mines. Type I mines are inspected weekly by DOT and are allowed to ship either to a point of use or to a redistribution terminal. Type II mines are inspected quarterly and also may ship either to a point of use or to a redistribution terminal. Type III mines are inspected annually and must ship to a redistribution terminal. They do not have the option of shipping directly to the point of use.
Any limestone passing through a redistribution terminal from any of the three types of mines must meet the 1.75% standard at the terminal. Dravo complains, however, that Type I and II mines can avoid the use of terminals and are therefore effectively subject to the 1.75% standard only at the mine, while Type III mines are forced to also meet the 1.75% standard at the terminal.[2] Dravo maintains that it can meet the 1.75% standard at its mine and can also meet the 3.75% standard at the point of use, but that it cannot also competitively meet the 1.75% standard at the redistribution terminal. Thus, it believes that DOT is arbitrarily keeping it from competing in the Florida market.
Dravo's frustration is understandable. It may well be that it could provide a quality product to the point of use under some other adequate and economical test procedures. It may well be that this additional competition would help reduce the cost of highways in Florida. It is not our task, however, to write the best rule for DOT. That was not the task of the hearing officer. Likewise, we have not been called upon to determine the constitutionality of a rule that may well have a discriminatory effect upon interstate or international commerce. See generally Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
In order to appreciate the significant limitations on our power in this type of case, it is useful to consider our scope of review in the context of: 1) the role of the hearing officer, 2) the recognized definitions of "arbitrary" and "capricious," and 3) the challenger's burden of proof in the administrative hearing. When a proposed rule is challenged before a hearing officer, it is the role of the officer to determine whether the rule is arbitrary or capricious. See § 120.56(1), Fla. Stat. (1989); § 120.52(8)(e), Fla. Stat. (1989). This is usually a fact-intensive determination. A proposed rule is "arbitrary" only if it is "not supported by fact or logic." Agrico, 365 So.2d at 763. It is "capricious" if it is taken "without thought or reason." Id.[3] The *635 party challenging the rule must prove its invalidity by a preponderance of the evidence. Id. When an appellate court reviews the factual findings made by a hearing officer in such a proceeding, its primary task is to determine whether the findings concerning the reasonableness of the rule are supported by competent substantial evidence. § 120.68(10), Fla. Stat. (1989); Adam Smith. Thus, under our limited scope of review, we must affirm the hearing officer's decision if there is competent substantial evidence in the record to support the determination that the challenger did not successfully prove the proposed rule to be arbitrary or capricious.
Dravo did present some evidence suggesting that it could provide limestone at the point of use which would meet the 3.75% standard even if its limestone failed the 1.75% test at the terminal. That, however, did not compel the hearing officer to invalidate the regulation. First, Dravo's evidence was not extensive and the hearing officer declined to give it great weight. Second, although Dravo is currently the only Type III mine seeking to do business in Florida, there are other mines that fall within that category which may seek to compete in Florida in the future. There is no evidence that the proposed regulations are unreasonable in relationship to the Type III mine classification as a whole. While the limestone from this one highquality mine may frequently be able to meet the 3.75% standard at the point of use even after extended transportation and storage, Dravo did not present evidence that this would generally be true for limestone from other mines within the Type III classification.
Dravo also argues that DOT has performed no scientific tests to conclude that the 1.75% standard is necessary at the terminal in order to meet the 3.75% standard at the point of use. While DOT essentially concedes that it did not perform careful, controlled scientific studies to create these standards, it did provide testimony from experienced state employees that the 1.75% standard has in the past, as a practical matter, resulted in limestone that meets the 3.75% standard at the point of use. For the purposes of these rules, such historic evidence, even if rather unscientific, supports the rule. To invalidate the rule, it was incumbent upon Dravo to provide evidence establishing, at a minimum, that a less restrictive standard could be employed at the terminal without significant risk to the suppliers' ability to meet the 3.75% standard at the point of use. It did not provide such evidence as would compel the hearing officer to invalidate the rule.
Affirmed.
RYDER, A.C.J., and PARKER, J., concur.
NOTES
[1] DOT defines "fine material" as those particles of limestone aggregate small enough to pass through a minus-200 sieve.
[2] While a Type III mine located in the continental United States might argue that it should be permitted to deliver directly to a point of use, it is obvious that Dravo must transport by ship and could not usually deliver its limestone directly to a point of use, even if the proposed rule permitted it to do so.
[3] Indeed, Agrico even suggests that an administrative decision is not arbitrary unless it is "despotic." 365 So.2d at 763. Webster's New World Dictionary suggests that an arbitrary decision is one that is "whimsical." Webster's New World Dictionary (V. Neufeldt 3d College ed. 1988). Likewise, "capricious" is defined in Agrico as "irrational." Such definitions add color and flavor to our traditionally dry legal vocabulary, but do not assist an objective legal analysis. If an administrative decision is justifiable under any analysis that a reasonable person would use to reach a decision of similar importance, it would seem that the decision is neither arbitrary nor capricious. Cf. Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla. 1980) ("The trial court's discretionary power is subject only to the test of reasonableness, but that test requires a determination of whether there is logic and justification.").