106 F.3d 403
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
SMITH PRODUCTION COMPANY, W.E. Brubeck, C.R. Faust, et al.,
Plaintiffs-Appellants,
v.
Don H. BALDWIN, Defendant-Appellee.
 No. 96-1746.
 United States Court of Appeals, Seventh Circuit.
 Argued Nov. 1, 1996.
Decided Jan. 24, 1997.
 
 Before CUMMINGS, BAUER and EASTERBROOK, Circuit Judges.
 
 ORDER
 
 1
 In 1907, George C. Snowden secured the rights to mine oil and gas on two plots of land through leases with Abraham and Rhonda Pepple ("the Pepple Lease") and A.C., Bertha, and Martin Droll ("the Droll Lease"). In 1944, Snowden assigned some of these rights under both leases to John E. Baldwin and reserved the remainder for himself. The Snowden Assignment declared, in relevant part:
 
 
 2
 Snowden & McSweeney, its successors and assigns, shall at any time and from time to time have the right to return any or all said leases to Baldwin and thereafter the ownership of such lease or leases shall be in this agreement an assignment otherwise provided just as though there had been no taking over for waterflooding by Snowden & McSweeney, its successors or assigns.
 
 
 3
 In 1957, John E. Baldwin and some of his family members assigned certain rights under the Pepple Lease ("the Pepple Assignment") to Texas Gulf Producing Company ("Texas Gulf"). The Pepple Assignment consisted of the rights to twenty-two wells and equipment with a value of $20,000. The Pepple Assignment contained the following relevant provisions:
 
 
 4
 The Assignee shall not surrender or abandon said leasehold premises for the production of oil or gas therefrom without first tendering ... a re-assignment of said Oil and Gas Lease and the leasehold estates thereby created. If such reassignment be accepted by the said parties or either of them, there shall be promptly paid to Assignee herein the fair salvage value of all leasehold property and equipment placed in or on said premises by Assignee....
 
 
 5
 In 1961, George E. Baldwin, Maude Baldwin, Hilma Baldwin, Don Hunter Baldwin, Lorene Baldwin, Patricia Sue Bowman, and Arnold Bowman, the successors to the rights of John E. Baldwin, assigned some of their rights under the Droll Lease to Texas Gulf ("the Droll Assignment"). The Droll Assignment consisted of the rights to six wells and equipment with a value of $2,500. The Droll Assignment virtually mirrored the Pepple Assignment except that it required that the assignees (Plaintiffs-Appellants) first tender an offer of reassignment to Baldwin before they could plug and salvage the wells or abandon the lease altogether. Specifically, the Droll Assignment stated:
 
 
 6
 .... PROVIDED, however, that in the event of such re-assignment, Assignee shall forthwith plug all wells in accordance with the appropriate laws and regulations of the State of Illinois, which Assignors herein do not elect to accept and operate....
 
 
 7
 Defendant-Appellee Don H. Baldwin ("Baldwin") is a successor to John E. Baldwin's and George E. Baldwin's rights in the Pepple Lease. He is also either the assignor referred to as "Don Hunter Baldwin" in the Droll Assignment or a successor to the rights of the several Baldwins listed in the Droll Lease. Plaintiffs-Appellants are successors to Texas Gulf's rights in both the Pepple and Droll Assignments.
 
 
 8
 This controversy began on August 5, 1994, when Plaintiffs, as working interest owners of the leasehold properties that comprise the Pepple and Droll Assignments, tendered to Baldwin an assignment of certain specifically identified wells, leasehold acreage, and formations. The reassignment was purportedly offered pursuant to the Droll and Pepple Assignments' requirement that Plaintiffs first tender an offer of reassignment to Baldwin before surrendering or abandoning the leaseholds' premises. In response, Baldwin accepted the tender but on the conditions set forth in assignments he proposed. Baldwin's assignments were not limited to the specified wells, leasehold acreage, and formations identified in Plaintiff's offer. Plaintiffs repeated this tender on two subsequent occasions. On November 15, 1994, Plaintiffs wrote Baldwin telling him that his suggested assignment did not constitute an acceptance of their offers of retender. They stated:
 
 
 9
 [I]t is our belief that an offer of retender is not required to be made for all of the wells and leasehold acreage or formations originally described or otherwise covered by the original assignments, but that the offers of retender may be made as limited in this writer's correspondence of August 5, 1994.
 
 
 10
 In response, Baldwin wrote that "[y]ou (Plaintiffs) should be aware that you have not complied with the terms and conditions of prior leases, agreements, and assignments, in that you are attempting to limit the retender to certain well bores and formations."
 
 
 11
 Plaintiffs filed a declaratory judgment action in the Federal District Court for the Southern District of Illinois, requesting that the district court determine whether Baldwin accepted Plaintiffs' limited offer of reassignment. In their complaint, Plaintiffs also asserted that if the district court decided that Baldwin did not accept their offer, then Baldwin's right to accept such offer has expired and that Plaintiffs are free from the Pepple and Droll Assignments' conditions to plug, abandon or assign the Pepple and Droll wells and leasehold estates.
 
 
 12
 On appeal, Plaintiffs maintain that if they are found to be the working interest owners in the Pepple and Droll Leases, they would have, in addition to the contractual duty found in the Droll Assignment, a statutory and common law duty to plug and salvage the Pepple and Droll wells. They contend that their statutory duty would arise from 225 ILCS 725/19.1. We note that 225 ILCS 725/19 provides, in relevant part: "[W]hen a well is abandoned, then such hole shall be plugged in accordance with rules and regulations formulated in pursuance of the provisions of this Act...." 225 ILCS 725/19.1 further provides, in relevant part:
 
 
 13
 If ... the Department finds that a well drilled for the exploration, development, storage or production of oil or gas ... has been abandoned ..., the Department shall issue an order that the well be properly plugged, replugged or repaired to remedy such situation.... The costs and expenses incurred by the Department under this Act shall be a debt due by the permittee together with interest....
 
 
 14
 Plaintiffs further argue that their common law duty would arise from cases which have stated that a lessee who abandons an oil well without proper plugging stands in the position of a tenant who surrenders the premises without making necessary repairs.
 
 
 15
 The parties differ as to whether Plaintiffs tendered a valid partial reassignment offer to Baldwin. If the reassignment offer was valid, Baldwin is the working interest owner of the wells, leasehold properties, and formations referred to in Plaintiffs' attempted assignment. If the reassignment offer was invalid, Plaintiffs remain the working interest owners. Plaintiffs argue that their tender of only a partial reassignment was valid and that therefore Baldwin must bear the cost of plugging and salvaging the wells referred to in Plaintiffs' attempted reassignment. Plaintiffs would bear responsibility for the benefits and burdens which would flow from the land, wells, and formations they retained. Baldwin asserts that Plaintiffs have failed to follow the terms of the Pepple and Droll Assignments. He believes that these assignments require that Plaintiffs retender to him of all or none of the assignments' respective land, wells, and formations. He argues that Plaintiffs' attempted partial retender offer was invalid and that he is the working interest owner of the Pepple and Droll leases and all that they entail. As such, he would enjoy the benefits of whatever royalties the leasehold estates generate, and he would also bear the expense of salvaging and capping any spent or unproductive wells.
 
 
 16
 On May 8, 1995, Baldwin filed the following alternative motions: a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, and a motion for summary judgment. On January 29, 1996, the district court granted Baldwin's 12(b)(1) motion to dismiss, finding that Plaintiffs had failed to meet the jurisdictional amount (in excess of $50,000) for a diversity action. Plaintiffs had maintained that the aggregate cost of plugging and salvaging the Pepple and Droll wells would have exceeded $50,000. However, the district court found that the cost of plugging and salvaging the Pepple wells was "collateral" and could not be included in measuring the amount in controversy.
 
 
 17
 The plaintiffs brought this case under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). The Act itself cannot confer subject matter jurisdiction upon a federal court. Ceres Terminals, Inc. v. Indus. Comm'n of Ill., 53 F.3d 183, 185 (7th Cir.1995). Instead, a declaratory judgment plaintiff must establish an independent basis for subject matter jurisdiction. Id. In the present case, the plaintiffs contend that the district court had diversity jurisdiction over the suit. The statute in issue, Title 28 U.S.C. § 1332(a)(1), provides: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between ... citizens of different states."
 
 
 18
 In general, we review dismissals for lack of subject matter jurisdiction de novo. Capitol Leasing Co. v. F.D.I.C., 999 F.2d 188, 191 (7th Cir.1993) (citations omitted). The jurisdictional amount is a matter tied up in subject matter jurisdiction in that, pursuant to § 1332(a)(1), parties must be diverse and the amount in controversy must exceed $50,000. However, the determination of the amount in controversy involves fact-specific scrutiny by the district court. Rexford Rand Corp. v. Ancel, 58 F.3d 1215, 1218 (7th Cir.1996). Thus, we review a district court's determination of the amount in controversy for clear error. Id. Finally, when a defendant disputes the plaintiff's allegation of the amount in controversy, the plaintiff must bolster his assertion with "competent proof." Id. (quoting McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936)).
 
 
 19
 In a declaratory judgment action, we measure the amount in controversy by the value of the "object of the litigation." Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 347 (1977). Under the "either viewpoint rule," we can calculate the value of the object of the litigation from the viewpoint of either party. McCarty v. Amoco Pipeline Co., 595 F.2d 389, 395 (7th Cir.1979). We consider "the pecuniary result to either party which the judgment would directly produce." Id. at 393 (citations omitted) (emphasis added). The amount in controversy constitutes the pecuniary results that flow directly and with a fair degree of probability from the litigation itself, not from collateral sources. See Columbia Gas Transmission Corp. v. Tarbuck, 62 F.3d 538, 543 (3rd Cir.1995); Kheel v. Port of N.Y. Auth., 457 F.2d 46, 49 (2nd Cir.), cert. denied, 409 U.S. 983 (1972). "Collateral sources" include incidental consequences, such as fines and expenses that a party may incur as a result of judgment. Columbia Gas, 62 F.3d at 543. If, after we calculate the amount in controversy, it appears to a "legal certainty" that the plaintiff has not satisfied the jurisdictional amount, we will dismiss the plaintiff's action. See Hunt, 432 U.S. at 346-48.
 
 
 20
 Such legal certainty eludes us in the present case. Plaintiffs stress that if the district court found their reassignment offer to Baldwin invalid, they could be required to plug either of the leasehold properties' wells under 225 ILCS 725/19.1. They could also be obligated to plug the Droll wells under the specific terms of the Droll Assignment. Plaintiffs contend that the aggregate cost of plugging the Droll and Pepple wells exceeds $50,000. However, the cost of plugging the tendered wells is only part of the amount-in-controversy equation. A working interest owner of the leasehold properties would also enjoy the revenue that would flow from the Droll and Pepple leasehold properties, wells and formations. The amount in controversy consists of the difference between this revenue and the cost of capping the inactive wells. The parties acknowledged at oral argument that neither of them has attempted to estimate the productive value of the Droll and Pepple leasehold properties, wells, and formations, an essential figure to the amount in controversy equation.
 
 
 21
 We REVERSE and REMAND this case to the district court for further proceedings as to the productive value of the Droll and Pepple leases.