<div style="border:1px solid black">

**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

</div>

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 9, 2017
Decided August 30, 2017

**Before**

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 17-1262

| | |
|---|---|
| JEFFREY R. GOLIN, | Appeal from the United States District |
|     *Plaintiff-Appellant*, | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 16 C 4259 |
| NEPTUNE MANAGEMENT CORPORATION, and JAMES M. GOLIN, | William T. Hart, |
|     *Defendants-Appellees*. | *Judge*. |

**O R D E R**

Jeffrey Golin is convinced that foul play led to the death of his father and seeks an autopsy to prove his suspicion, but his half-brother, James Golin, is adamantly opposed. Jeffrey sued both James and Neptune Management Corporation, the cremation provider that currently holds his father's body, purportedly under the diversity jurisdiction. Jeffrey seeks a declaration that he, not James, has the right to decide if an autopsy should be performed. The district court concluded that both Jeffrey and Neptune are citizens of California and dismissed for lack of complete diversity. We conclude that Neptune has no stake in the autopsy dispute and should not have been part of the suit from the outset. The inescapable jurisdictional defect, however, is that

Jeffrey has not come close to alleging an amount in controversy exceeding the $75,000 minimum, *see* 28 U.S.C. § 1332(a). We thus affirm the district court's dismissal for lack of jurisdiction.

Jeffrey's complaint provides an exhaustive (and obviously heartfelt) account of the decline and death of his father, Milton, but the underlying facts are irrelevant to the jurisdictional question before us. In brief, a year before he died, Milton was placed in an Illinois nursing home by his son James, who had been given a medical power of attorney by Milton "some years before." Milton had been diagnosed with Alzheimer's disease but had *not* been adjudicated incompetent. According to Jeffrey, Milton hated the nursing home and wished to live with him in California. Jeffrey and Milton retained an attorney, who helped Milton revoke the medical power of attorney given to James, execute a new medical power of attorney in favor of Jeffrey, and sign a document demanding his discharge from the nursing home. But the facility's management refused to recognize the new documents, called the police when Jeffrey tried to help Milton leave, and, at James's behest, thwarted communication between Milton and Jeffrey. Milton died shortly thereafter. Jeffrey insists that Milton's death "was actually euthanasia—based on James' authorization and request."

Milton's body was taken to Neptune for cremation according to an advance directive. Jeffrey says that he arranged for a private autopsy to be conducted at his own expense, but James intervened and persuaded Neptune not to permit the autopsy. Because of the quarrel over which brother has legal authority to control the disposition of Milton's remains, Neptune asked for "a court order or other suitable confirmation that the dispute was resolved." Neptune's managing counsel affirmed that the company "will be happy to follow the direction of the Court," but, absent a legal resolution of the conflict, "it would be inappropriate for Neptune Society to adjudicate the dispute."

Jeffrey, who has earned a law degree but is not a licensed attorney, brought this suit pro se against both James and Neptune. He sought a temporary restraining order preventing Milton's cremation, a judgment declaring that Milton had validly revoked James's power of attorney, and an injunction ordering James not to interfere with the autopsy—but no damages. Jeffrey invoked the district court's diversity jurisdiction, pleading that he is a citizen of California, James is a citizen of Illinois, and Neptune is incorporated in Florida with its principal place of business in Texas. Regarding the amount in controversy, Jeffrey alleges that "the benefit to the plaintiff is the enhanced monetary value of forthcoming litigation for damages included in a forthcoming wrongful death and negligence action against several defendants," which, his complaint

explains, "could ordinarily result in an award against the several defendants . . . of anywhere from $100,000 to $4,000,000."

Neptune answered that it "has <u>no</u> position in this dispute" and simply is preserving, and will continue to preserve Milton's remains by refrigeration "while this dispute is pending." But the company's answer discloses that Neptune is actually incorporated in California—which prompted the district court to order the parties to explain why the case should not be dismissed for lack of complete diversity. Jeffrey then acknowledged that Neptune is not diverse but asserted that "complete diversity can be restored" by allowing him to amend his complaint to substitute Service Corporation International ("SCI"), a Florida corporation with its principal place of business in Texas. SCI is the proper defendant, Jeffrey contended, because it had purchased a 70% share in Neptune several years earlier and, as soon as the dispute between the brothers arose, SCI's corporate counsel had "intervened and took over the case … and made all the controlling decisions." But once again Neptune insisted that it isn't taking sides in the dispute between the brothers and that it simply "needs an order or other suitable confirmation that the dispute has been resolved or settled before it can release the remains for autopsy or cremation." Neptune also explained that it had asked Jeffrey to voluntarily dismiss the company so he could proceed against James, but Jeffrey refused. Then at a status hearing, Neptune's counsel stated unequivocally that, should his client be dismissed from the suit, it would "[a]bsolutely" abide by whatever ruling the court made regarding which brother had the legal right to control Milton's remains. Neither James nor Neptune challenged Jeffrey's assertion that the suit placed more than $75,000 in controversy.

The district court dismissed the suit for lack of complete diversity. The court rejected Jeffrey's attempt to substitute SCI for Neptune, reasoning that Jeffrey had not alleged "that a basis exists for piercing the corporate veil" of Neptune. Jeffrey appeals, though James and Neptune have declined to participate.

As a quick initial matter, we don't think that either Neptune or SCI should be part of Jeffrey's suit in any court. The Illinois Disposition of Remains Act shields a "cemetery organization or funeral establishment" from liability for refusing to inter, accept, or dispose of a "decedent's remains, until it receives a court order or other suitable confirmation that the dispute has been resolved or settled." 755 ILCS 65/50. And that statute has been interpreted to mandate the dismissal of suit against a funeral home because it "is not the role of funeral homes and cemeteries to judge the relative legal rights of feuding family members." *Carlson v. Glueckert Funeral Home, Ltd.*, 943

N.E.2d 237, 242 (Ill. App. Ct. 2011). Jeffrey believes that either Neptune or SCI is an indispensable party because, he contends, the district court must have personal jurisdiction to enjoin the company. But Neptune has consistently expressed its intention to abide by any decision rendered by "a court of competent jurisdiction," as the statute instructs, rendering an injunction unnecessary.

Turning to the jurisdictional question before us, the district court was correct that Jeffrey cannot pursue his claim in federal court, but the answer does not turn on whether he can pierce Neptune's corporate veil. Veil-piercing "is not itself an action; it is merely a procedural means of allowing liability on a substantive claim." *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004). In other words, it is an equitable remedy available when respecting the corporate form "would promote injustice or inequity" by allowing a targeted corporation to escape liability for wrongdoing. *Id.* at 737; *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378–79 (7th Cir. 2008) (explaining that, under Illinois law, piercing the corporate veil is disfavored and requires showing that target corporation is a sham or no longer has separate existence from another entity or person). Thus veil-piercing is a rule of liability—a means of determining who pays for wrongdoing—not a basis on which to determine citizenship for diversity purposes. Jeffrey would need to pierce Neptune's corporate veil if he was trying to obtain *damages* from SCI for wrongful acts committed by the subsidiary, but even then he wouldn't need to pierce the veil simply to *name* SCI in his complaint. On this point the district court was mistaken.

Jeffrey has two theories about why this court should remand and allow his case to proceed. First he contends that the district court abused its discretion by not allowing him to amend his complaint to name SCI, rather than Neptune, as the "real party" because "SCI took over the action from its subsidiary Neptune" and should thus be held liable under the "direct participant liability of a parent corporation." This ignores the fact that Jeffrey doesn't allege that either Neptune or SCI is *liable* for anything—his quarrel is with James alone, and Neptune has made crystal clear its willingness to allow an autopsy if Jeffrey prevails. Alternatively, Jeffrey urges the court to find that Neptune is a "passive neutral part[y] to the case" and "realign" it to be a *plaintiff* in his suit against James, thus creating complete diversity. As we understand his argument, Jeffrey contends that Neptune is a nominal party—the holder of the "stakes" of the litigation but without any real interest in the outcome. It is true that a purely nominal party does not affect diversity jurisdiction. *See Walden v. Skinner*, 101 U.S. 577, 589 (1879) (ignoring citizenship of party named only "to perform the ministerial act of conveying the title if

adjudged to the complainant"); *Matchett v. Wold*, 818 F.2d 574, 575–76 (7th Cir. 1987) ("The addition to a lawsuit of a purely nominal party—the holder of the stakes of the dispute between the plaintiff and the original defendant—does not affect diversity jurisdiction."); *see also* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1556 (3d ed.). And it seems clear that Neptune has no interest in whether James or Jeffrey is judged to have the operative power of attorney; all parties agree that Neptune will eventually cremate Milton's remains. The only question is whether an autopsy will first be performed.

That Neptune may be a nominal party does not mean that Jeffrey has properly invoked the diversity jurisdiction. Neither the district court nor the defendants challenged Jeffrey's assertion that more than $75,000 is at stake in the litigation, but certainly there is not, and this is the incurable jurisdictional defect in the suit. Jeffrey does not seek *any* money; rather, he wanted a temporary restraining order preventing Milton's cremation (a demand mooted by Neptune's pledge to store the body until the case is resolved), a judgment declaring that he holds the valid power of attorney, and an injunction ordering James not to interfere with the autopsy. "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). In this circuit, that value may be calculated by measuring the benefit to the plaintiff *or* the detriment to the defendant, but either way the value must be reasonably determinable. *Macken ex rel. Macken v. Jensen*, 333 F.3d 797, 799–800 (7th Cir. 2003) ("When the monetary value of a controversy cannot be estimated, litigation must commence in state court."); *see Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1268–70 (11th Cir. 2000) (explaining that injunctive relief sought in diversity suit must not be too speculative or immeasurable to determine amount in controversy because liberal pleading standard is not "license for conjecture"). At oral argument Jeffrey insisted that the defendants have the burden to disprove subject-matter jurisdiction, but that is incorrect; "the principle that a case may be dismissed only if the court is certain that the plaintiff cannot recover the jurisdictional amount … is the rule for damages actions, not equitable actions." *Macken ex rel. Macken*, 333 F.3d at 800 (internal citations omitted). Yet Jeffrey hinges the alleged amount in controversy on pure speculation that an autopsy will lead to evidence supporting tort claims in a *different suit* against *different defendants*: "The benefit to the Plaintiff here is the enhanced monetary value of forthcoming litigation for damages in a potential wrongful death, survivorship and negligence action, which would easily exceed the jurisdictional minimum." Jeffrey cannot pin his invocation of federal jurisdiction on the hope that he'll be able to bring a *later* suit for more than $75,000. *Cf. America's Moneyline, Inc. v.*

*Coleman*, 360 F.3d 782, 785–87 (7th Cir. 2004) (rejecting argument that amount in controversy in action to compel arbitration could be measured by stakes in underlying class action, rather than individual claim subject to petition itself). The only monetary benefit or detriment that will flow to either party from resolution of *this* lawsuit is the cost of the autopsy itself, which Jeffrey acknowledges is $2,600. He has failed to allege an amount in controversy anywhere near the statutory minimum.

We thus affirm the district court's dismissal for lack of subject-matter jurisdiction.