[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this administrative appeal the plaintiff is challenging the decision of the Connecticut Department of Public Utility Control ("DPUC") in Docket No. 96-09-22 dated April 23, 1997, and issued April 24, 1997.[1] The decision essentially approved The Southern New England Telephone Company ("SNET") cost assignment and allocation methodology proposed to implement throughout Connecticut a multibillon dollar hybrid fiber coaxial CT Page 8873 system ("HFC") to provide telephone and cable service. The HFC system will replace the existing copper wire system and be used by SNET to provide telephone service, and by SNET-Americast (a SNET wholly owned subsidiary company) to provide cable services. The decision approves a cost assignment of the HFC system between telephonic and cable services and allocation of common costs on a 50/50 shared basis between the telephone service provider (SNET) and the cable service provider (SNET-Americast). The plaintiffs are competitors of SNET-Americast in providing cable television services.
The DPUC decision in Docket No. 96-09-22 addressed issues that were once part of Docket No. 95-06-17, which dealt with SNET's proposal to offer various interconnection services to competing telephone service providers. Such interconnection services were encouraged if not required by Public Act 94-83. In its decision, the DPUC quoted from its December 20, 1995 decision in Docket No. 95-06-17:
 A generally recognized and accepted tenet embodied in Public Act 94-83 is that cost must serve as the primary determinant of telecommunications prices if economic efficiency is to prevail in the multi-provider market envisioned by the legislature. Determining appropriate cost thresholds for services such as those presented in this proceeding is especially important. The services proposed in this proceeding represent exclusive offerings of SNET which will be made available to prospective competitors for reuse in their own competitive service offerings. A cost and associated price that is too high will discourage competitive entry and severely limit broader market participation. A cost and associated price that is too low will greatly increase the level of financial benefit presented to prospective providers by resale competition and discourage the development of alternative telecommunications infrastructure in Connecticut, possibly limiting the choice of services and providers intended by passage of Public Act 94-83.
(ROR, Item XVI.1, Decision, p. 3.) The DPUC listed the substantive deficiencies in the SNET cost studies that it had CT Page 8874 noted in its December 20, 1995 decision in Docket No. 95-06-17. (ROR, Item XVI.1, pp. 3-4.)
Interconnection arrangements between SNET and other telecommunications carriers were substantially impacted by the Telecommunications Act of 1996, 47 U.S.C. § 251, et seq. These statutory changes were subject to an August 8, 1996 FCC order (ROR, Item XVI.1, Decision, pp. 5-6, First Report and order, CC Docket No. 96-982 and CC Docket No. 95-185. A stay of the FCC order was entered by the Eighth Circuit Council of Appeals. Iowa Utilities Board v. Bell Atlantic, No. 96-33-21 USCA 8th Cir. July 18, 1997.
The DPUC on October 30, 1996, recognized that its December 20, 1995 decision in Docket No. 95-06-17 was not consistent with the Telecommunications Act of 1996 and must be modified. The DPUC determined to reopen Docket No. 95-06-17 to review wholesale local service rates in view of the 1996 Act. Also, the DPUC initiated proceedings in this Docket No. 96-09-22 to investigate SNET's proposal to offer unlicensed loops, ports and associated interconnection arrangements initially filed in Docket No. 95-06-17.
These proceedings were initiated by Notice of Hearing dated January 14, 1997. Parties to the agency proceedings included: SNET; the State of Connecticut Office of Consumer Counsel (OCC); ATT Communications of New England; MCI Telecommunications Corporation; MFS Internet of Connecticut; Connecticut Telephone; Cablevision Lightpath, Inc.; Frontier Communications, Inc.; New England Cable Television Association (NECTA); Brooks Fiber Communications; Connecticut Ad Hoc Telecommunications Users Group; MFS Telecom, Inc.; Sprint Communications Company, L.P.; Teleport Communications Group; WilTel, Inc.; and Message Center Beepers. Public hearings were held on February 3, 4, 5, 7, and 24, 1997 at the DPUC offices. The parties were afforded opportunities to respond to the March 31, 1997 draft decision.
The plaintiffs bring this appeal pursuant to the Uniform Administrative Procedures Act (UAPA), § 4-166, et seq.; §4-183. The appeal was timely filed on June 11, 1997. The answer and record were filed on September 26, 1997 and the record was supplemented on April 15, 1998. Briefs were filed by the plaintiff on December 3, 1997, DPUC on January 22, 1998, and SNET on January 22, 1998.
In order to have standing to bring this administrative CT Page 8875 appeal, the plaintiffs must prove aggrievement. United CableTelevision Services Corp. v. DPUC, 235 Conn. 334, 342 (1995);Connecticut Business Industry Ass'n Inc. v. Commission onHospitals Health Care, 214 Conn. 726, 729 (1990).
The test for aggrievement is two fold. First parties must demonstrate a specific personal and legal interest in the decision as distinguished from the general interest of all members of the community, State Medical Society v. Board ofExaminers in Podiatry, 203 Conn. 295, 299-300 (1987). Second, parties must show that such interest has been specially and injuriously affected by the decision. United Cable v. DPUC, supra, 235 Conn. at 342-43. "Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) O'Leary v. McGuinness,140 Conn. 80, 83 (1995); Hall v. Planning Commission,181 Conn. 442, 445, (1980).
The plaintiff is an organization of cable television service providers. This court has recognized representational standing.Connecticut Association of Not-for-Profit Provides v. DSS,244 Conn. 378, 386 (1998).
 This court has recognized representational standing in accordance with the holdings of the United States Supreme Court. "[A] association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. [Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)]. . . . " (Citations omitted.) Connecticut Assn. of Health Care Facilities, Inc. v. Worrell, 199 Conn. 609, 616, 508 A.2d 743 (1986). We went on to note that the propriety of accepting [r]epresentational standing depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can CT Page 8876 reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. . . . Associational standing is particularly appropriate where the relief sought is . . . a declaratory judgment [pursuant to General Statutes § 4-175]. . . . " (Internal quotation marks omitted.) Id. We subsequently concluded that the Worrell rationale was not limited solely to declaratory judgment actions brought directly to the Superior Court pursuant or § 4-175, and that it is to be applied with equal force to any administrative appeal brought pursuant to § 4-183. Connecticut Business Industry Assn. v. Commission on Hospitals Health Care, 218 Conn. 335, 344, 589 A.2d 356 (1991). In so concluding, we specifically acknowledged its applicability to an association seeking a declaratory ruling pursuant to § 4-176. Id., citing State Medical Society v. Board of Examiners in Podiatry, 203 Conn. 295, 304-305, 524 A.2d 636 (1987).
The plaintiff's membership includes twenty-two cable franchise operating systems in the State of Connecticut.
These operating cable franchises have demonstrated a specific personal and legal interest in the subject matter of the DPUC's decision. The essence of the decision effects the allocation of the HFC common costs between telephone service and cable providers. The HFC cable provider SNET-Americast is a direct competitor with the twenty-two Connecticut cable franchises.
The cable franchise competitors have an asset with substantial economic value. This interest is a sufficient personal and legal interest which satisfies the first prong of the aggrievement test.
The interest is injured in a way cognizable by law if the HFC cable service provider has a competitive advantage through cross subsidization of the cable system by telephone service customers.
The plaintiff's cite the public policy articulated in §16-247a "it is, therefore, the goal of the state to . . . (2) promote the development of effective competition . . ." in telecommunications. CT Page 8877
Competition that is merely harmful to the complainant's business would generally not be sufficient to qualify one as an aggrieved person. Gregorio v. Zoning Board of Appeals,155 Conn. 422, 426 (1962). Whitney Theatre Co. v. Zoning Board of Appeals,150 Conn. 285, 288 (1963). However, a limited exception is recognized if the competition is unfair illegal. United Cable v.DPUC, supra, 235 Conn. 344; State Medical Society v. Board ofExaminers in Podiatry, supra, 203 Conn. 302-03.
Cross subsidization would be illegal under state and federal law. General Statutes § 16a-247a; Telecommunications Act of 1996. The plaintiffs are thus aggrieved for purposes of challenging the competitive impact of the DPUC decision on HFC cost allocation.
An understanding of the issues requires a brief historical review of the development of competitive telecommunications in Connecticut. SNET has for many years operated as part of a telephone exclusive monopoly regulated telecommunications provider. Public Act 94-83, codified as General Statutes §16-247, et seq., radically altered public policy in telecommunications by replacing a highly regulated monopoly system with a competitive, less regulated environment. The DPUC is directed to implement this policy. Since 1994, at least eighteen companies have been certified to provide local telecommunication services in Connecticut. (See ROR, Item XVI.1, p. 1.)
The Telecommunications Act of 1996 (47 U.S.C. § 251, et seq.) reflects a similar federal policy of encouraging telecommunications competition.
In implementing the state and federal policies, the DPUC has recognized that SNET as the local exchange carrier (LEC) must allow other telecommunication providers to interconnect with its existing local network in order to provide competing local telephone service. The eighteen local competing telecommunications providers do not each need to put up their own poles and run their own wires. Similarly, it is recognized that the LEC must sell wholesale to other telecommunication carriers services that it provides to retail customers. Federal law requires that an incumbent LEC's wholesale rates for interconnection and unlicensed network elements be nondiscriminatory and based on the cost of providing the CT Page 8878 interconnection or network element plus a reasonable profit.47 U.S.C. § 252 (d)(1).
This case involves the DPUC investigation of SNET's proposal for certain unlicensed elements. SNET sought approval of its cost study methodology, Total Service Long Run Incremented Cost (TSLRIC) studies, proposed markup, and, most importantly to the plaintiff, the proposed allocation of its joint costs associated with its HFC network.
The HFC system will replace the existing copper based telephone line system with a state of the art system which will include a narrow band range for telephone service and a broad band range for cable services. The cable service will be used by a SNET affiliate company, SNET-Americast, which will compete for cable television customers with the plaintiff's[2] members.
The basis of the plaintiff's complaint is that SNET is shifting a disproportionate share of the cost of the interrelated HFC system to regulated local telephone customers and gaining a competitive advantage for its cable affiliate.
SNET proposed, and the DPUC approved, a 50/50 allocation of the common costs of the HFC system between the telephone and cable service providers. NECTA advocated a 100% attribution to the cable providers. The Court finds the issues for the defendants DPUC and SNET. The DPUC decision is affirmed.
The plaintiff raises three arguments in its brief: 1) the DPUC failed to conduct reasoned decision-making with respect to its approval of SNET's assignment and allocation of its HFC network costs;[3] 2) the DPUC failed to articulate any explanation for its complete reversal regarding HFC assignment and allocation, and 3) the DPUC approval of SNET's HFC assignment and allocation is not based on substantial evidence in the record.
A basic principle of administrative law is that the scope of the court's review of an agency's decision is very limited. General Statutes § 4-183 (j) provides that "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact . . . The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or CT Page 8879 decisions are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record."
Furthermore,"[j]udicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." Conn. Light Power Co. v. Dept. of Public UtilityControl, 219 Conn. 511, 57-58 (1991). Similarly, "[w]ith regard to questions of fact, it is [not] the function of the trial court . . . to retry the case or to substitute its judgment for that of the administrative agency." Id. "The question is not whether the trial court would have reached the same conclusion but whether the record before the commission supports the action taken." Hospital of St. Raphael v. Commission on Hospitals Health Care, 182 Conn. 314, 318 (1980).
"Judicial review of [an administrative agency's] action is governed by the Uniform Administrative Procedure Act (General Statutes, c. 54, 4-166 through 4-189), and the scope of that review is very restricted . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the [administrative agency] . . . The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of [its] discretion." (Citations omitted; internal quotation marks omitted.) Board of Education v. Freedom of Information Commission, 208 Conn. 442, 452 (1988).
Nevertheless, where "the issue is one of law, the court has the broader responsibility of determining whether the administrative action resulted from an incorrect application of the law to the facts found or could not reasonably or logically have followed from such facts. Although the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion." United Parcel Service, Inc. v.Administrator, Unemployment Compensation Act, 209 Conn. 381, 385
(1988).
"Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its CT Page 8880 discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . (I]t is for the courts, and not administrative agencies to expound and apply governing principles of law." (Citations omitted; internal quotation marks omitted.)Connecticut Light Power Co. v. Texas-Ohio Power, Inc.,243 Conn. 635, 642-43 (1998).
An element of the DPUC decision is a recognition of the value of the HFC system for telephone providers. This was recognized in an earlier DPUC decision in Docket No. 95-03-01 and is supported by the record in this case (January 22, 1998 Supplemental ROR, p. 7, Davis testimony; ROR, Item 111.6, Mulla Rebuttal Testimony, p. 2). The HFC system is technologically superior and should be available at lower costs for telephone users than the existing copper based system.
The instant case is not the first in which the DPUC has addressed HFC costs. In Docket No. 95-03-10 SNET unsuccessfully proposed allocating common and joint HFC costs based on the number of subscribers. This proposal would have thus assigned nearly all the HFC costs initially to telephone subscribers. The DPUC rejected such proposal in its June 30, 1995 decision in Docket No. 95-03-10 noting the inadequacy of evidence on which to judge the reasonableness of the common cost assignment.
HFC cost assignment was again addressed by the DPUC in Docket no. 95-06-17. SNET provided cost studies which used a similar allocation method as had been proposed in Docket No. 95-03-10 with a resulting 64% of HFC costs to telephone subscribers. At the time of these earlier decisions there was no actual HFC deployment and in essence the DPUC's pre-approval was sought.
The DPUC has in other proceedings determined the value to telephone subscribers of the HFC system. In Docket No. 95-03-01 it stated; "the Department has concluded that telephone subscribers will, without a doubt derive some benefit from the HFC system." DPUC Decision, Docket No. 95-103-01, pp. 98-99.
In this case the DPUC was faced with the actual existence of the HFC system and the need to address common costs of the HFC system.[4]
SNET had never previously proposed a 50/50 common cost of HFC CT Page 8881 assignment. The proposal of 50/50 was based on a maximum projected usage of one cable line for each telephone line. This projected calculation and allocation are substantially more favorable to the plaintiff. The previous SNET proposals related to the HFC network common or joint costs allocated a preponderant share to the telephone subscribers. Certainly the initial use of the HFC network is primarily telephony rather than cable. In extensive hearings there was no evidence which would suggest that foreseeably cable lines will exceed telephone lines. A more compelling claim could be made that telephone lines will continue to exceed cable lines in the HFC system. The SNET proposal approved by the DPUC involves assignment of costs to telephone, cable or joint categories. Costs which can be directly attributable to either service are so allocated. Costs which are joint are divided 50/50 based on projected usage.
The DPUC's exercise of its decision making power is evident in the decisions on the earlier applications relating to the allocation of costs for the HFC network. In Docket No. 95-03-10, the DPUC rejected a proposal lacking actual costs data. In Docket No. 95-06-17, the DPUC rejected the SNET approach on the economic principle of cost causation. DPUC Decision, Docket No. 95-06-17, p. 77.)
The DPUC decision subject to this appeal resolves the central issue:
 The Department stated that it would address the allocation of video allocations in this proceeding. The Department has been presented with two basic allocations for common and joint costs; a 50/50 split between telephony and video, proposed by SNET, and 100% allocation to video implicit in the parties' presentations. Alternatively, the Department could require SNET to conduct more studies, as suggested by NECTA witness Dr. Johnson. It would not be reasonable to allocate to either telephony or video 100% of the common and joint costs because the system benefits both services. SNET has demonstrated to the Department's satisfaction that the joint system is potentially less costly for telephony customers, and therefore, it is not reasonable or necessary to require SNET to undertake additional studies before the Department determines a CT Page 8882 reasonable allocation of common and joint costs. Additionally, the Department is not convinced that SNET should be directed to cost its services as if they were being provided over a copper/fiber network. SNET is convinced that HFC is the most efficient way for it to proceed in developing its network. If this is in error, the Department encourages the CLECs to build and operate a less costly, more efficient network. SNET, on its own, with its own assessment of the risks and rewards, has decided to move to an HFC network If the market does not hold SNET to its projected costs, the Department has every intention of doing so for SNET's telephony customers. The Department will insure that video costs are not recovered from telephony customers now or in the future. The Department finds a 50/50 sharing of common and joint costs to be reasonable. The Department will also continue to examine the so-called directly assigned costs of the HFC network to ensure against cross-subsidy.
(ROR, Item XVI.1, p. 53.)
The DPUC decision, when viewed in the context of the progression of proceedings related to the HFC system, was not a reversal of earlier decisions. This case presented the first scenario in which SNET presented actual HFC costs and the rationale of a 50/50 allocation based on a maximum usage projection.
The cost causation principles of this decision are followed by the direct cost allocations which preceded any determination of joint or common costs.
In Docket No. 95-03-10 it was not established that the telephone service costs would not be adversely impacted by the joint VDT-telephony system. The record and specific findings establish in this docket the beneficial impact of the HFC system on telephone service costs and rates. (ROR, Item XVI.1, p. 59; see also DPUC Decision, Docket No. 96-01-24; Docket No. 95-03-01, pp. 98-99). The SNET cost studies were discussed in detail by the DPUC in this decision and found greatly improved with sufficient documentation. (ROR, Item XVI.1, pp. 45-54.) CT Page 8883
The court has reviewed the voluminous record in this case and considered the historical background of the HFC network cost allocation issue before the DPUC and the goals 16 of Public Act 94-83. In light of these factors, the court finds that the DPUC did not make a "complete reversal" of us earlier decisions and did not fail to conduct reasoned decision-making in this case.
The plaintiff's evidentiary claim is measured by the standard of the substantial evidence rule.
"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact." (Citations omitted; internal quotation marks omitted.) Dolqner v. Alander, 237 Conn. 272, 280 (1996).
"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183(j)(5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action." (Citations omitted; internal quotation marks omitted; footnote omitted.)Dolgner v. Alander, supra, 237 Conn. 281. Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) Id.
The evidence supporting the allocation of direct costs between telephone and cable (narrow band vs. broad band) is substantial (ROR, Item XV.1, transcript, pp. 38-46, Mulla testimony.) Each of the joint cost elements[5] is rationalized in evidence presented in the record. (ROR, Item XV.1, transcript, pp. 38-46, Mulla testimony, Item VIII.2, Ex. 1.) CT Page 8884
The plaintiff specifically challenges the allocation of amplifier costs to telephone subscribers, but even the plaintiff's expert conceded the need for amplifiers for telephone services on HFC. (ROR, Item transcript, XV.6, pp. 1094-98; Johnson testimony.) Many of the components in the HFC system are necessary for both video and telephone service. See ROR, Item XV.6, transcript, pp. 1094-98, Johnson testimony.) This was confirmed and justified on a 50/50 allocation by the SNET testimony. (See ROR, Item XV.4, transcript, pp. 619-23, Mulla testimony.)
SNET also produced testimony that an HFC system for only telephone services, would be more expensive than the telephony 50% share of the integrated HFC system. (ROR, Item XV.8, transcript, p. 1372, Mulla testimony.)
The allocation of common costs of the integrated HFC system is not subject to exact mathematical calculation. It involves sophisticated economic analysis. In extensive hearings on February 3, 4, 5, 6, 7, and 24, 1997, the DPUC considered expert testimony and further afforded the parties the opportunity to file written exceptions and oral arguments on its draft decision dated March 31, 1997. An expert provided by proponents of the SNET plan testified regarding the economic rationalization of the allocation, noting that the HFC costs for telecommunications would be lower than the existing copper system. (ROR, Item XV.1, transcript, pp. 57-58, Taylor testimony.) This conclusion was supported by other testimony. (See ROR, Item XV.1, transcript, pp. 171-73, Davis testimony.) The DPUC as the trier of fact was in no way obligated to believe the plaintiff's expert evidence.Bancroft v. Commissioner of Motor Vehicles, 48 Conn. App. 391,405 (1998), cert. denied, 245 Conn. 917 (1998).
The DPUC could also rely on its own economic expertise in evaluating the SNET proposal. Connecticut Natural Gas 19 Corp. v.PUCA, 183 Conn. 128, 137 (1981); General Statutes § 4-187 (4).
The DPUC decision recognizes the legislative mandate to facilitate telecommunications system improvements in a competitive environment. The decision reasonably facilitates technological advancement with the HFC system, without adversely impacting competition in either telephone or cable services.
The decision is affirmed and the appeal is dismissed. CT Page 8885
Robert F. McWeeny, J.