ON REHEARING GRANTED
ROLAND L. BELSOME, Judge.
1, Appellants, Vieux Carre Property Owners, Residents, and Associates, Inc. and French Quarter Citizens for the Preservation of Residential Quality, Inc., appealed the trial court’s grant of Appellees’ Exception of No Right of Action. After hearing arguments, this Court affirmed the trial court’s judgment. Vieux Caire Property Owners, Residents and Associates, Inc. v. Hotel Royal, L.L.C., 2009-0641 (La.App. 4 Cir. 2/3/10), 2010 WL 395912, 55 So.3d 1. Rehearing in the matter was granted and arguments heard on October 20, 2010.
FACTS AND PROCEDURAL HISTORY
Appellants filed a petition for declaratory judgment and for preliminary and permanent injunction against Appellees, Hotel Royal, L.L.C., 1004-1006 Royal, L.L.C., 625 St. Philip, L.L.C., and The Melrose Group, L.L.C., alleging that Appellees had violated various local zoning ordinances. In response, Appellants filed Exceptions of Lack of Procedural Capacity, No Right of Action, and Prescription, asserting that Appellants’ claims were prescribed and that Appellants | Jacked standing and a right of action. After a hearing, the trial court sustained Appellees’ Exception of No Right of Action, and this Court affirmed. We granted rehearing in the matter to expand upon our reasoning in this Court’s previous decision.
STANDARD OF REVIEW
Judgments sustaining an exception of no right of action are reviewed de novo. Fortier v. Hughes, 2009-0180, p. 2 (La.App. 4 Cir. 6/17/09), 15 So.3d 1185, 1186.
DISCUSSION
Whether Appellants have standing to bring suit on behalf of its members involves a three-part inquiry. See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); Louisiana Hotel-Motel Association v. Parish of East Baton Rouge, 385 So.2d 1193, 1196 (La.1980). The three-part test set forth by the United States Supreme Court, and adopted by the Louisiana Supreme Court, involves first determining whether the members of the organization would otherwise be able to bring suit in their own right; second, whether the interests the association wished to protect were pertinent to its purpose; and third, the organization must also establish that neither the claim asserted by the association nor the relief sought required the participation of individual members.[1] Id.
| .-¡Appellants’ petition for damages alleged that failure to enjoin the expansion of Appellees’ property “threatens the architectural, historical, cultural and aesthetic integrity, and values of the Vieux Carre” and “adversely affects the tout ensemble of the Vieux Carre and opens the entire Vieux Carre to significant alteration of the character and massing of its existing historic buildings” which would “adversely af *7 fect[ ]” the “quaint and distinctive character of the Vieux Carre.” The petition also asserted that Appellees’ expansion would also “disrupt[ ] the scale and low density of the surrounding buildings and the residential character and environment” and “will create additional traffic resulting in congestion, noise, and other activities destructive to the French Quarter.”
In affirming the decision of the trial court, this Court determined that Appellants did not satisfy the first prong of the three-part test because Appellants failed to establish harm that was “present or probable for the future” for its members and also failed to demonstrate “clear, direct economic injury to [its] members.” Louisiana Associated General Contractors, Inc. v. State of Louisiana, 95-2105 (La.3/8/96), 669 So.2d 1185, 1191, n. 4; see also Louisiana Hotel-Motel, 385 So.2d at 1197. As the Hunt test is phrased in conjunctive terms, the failure to satisfy any part of the inquiry is dispositive, and further examination is unnecessary.
It is well-settled in Louisiana that a plaintiff must have a real and actual interest in the action he asserts. La. C.C.P. art. 681. Without a showing of a special interest that is separate and distinct from the interest of the general public, a plaintiff may not proceed. League of Women Voters of New Orleans v. City of New Orleans, 381 So.2d 441, 447 (La.1980); Richardson v. Reeves, 600 So.2d 138, 140 (La.App. 2 Cir.1992).
Applying the first prong of the Hunt/Louisiana Hotel-Motel test, we find that the first threshold requirement, the demonstration of harm that is present or probable for the future, was simply not established in this case. See Hunt, supra. Appellants merely asserted that Appellees’ alleged zoning violations would result in a decline in the charm and distinctive character of the neighborhood as a whole, the Vieux Carré. Not only is such an allegation entirely subjective, it is also not susceptible of measurement. Furthermore, the hypothetical possibility of increased congestion and noise as a result of the alleged zoning violations also does not rise to the level of “present or probable future harm.” See Hunt, supra.
In Guillot v. Brooks, 26,544, p. 1 (La. App. 2 Cir. 3/1/95), 651 So.2d 345, 346-347, a case relied upon by Appellants, a group of neighbors sought injunctive relief and the enforcement of a zoning ordinance. As this Court previously noted, Guillot involved individual private landowners. See Vieux Carre, supra, at n. 5. The Guillot plaintiffs alleged violations of local zoning ordinances and damages as a result of a neighbor’s use of his property as a landing strip for light aircraft. Guillot, p. 1, 651 So.2d at 347. In upholding the trial court’s determination that the plaintiffs had standing to sue to enforce zoning violations, the Court acknowledged the evidence that was submitted with respect to specific and concrete damages sustained by the individual landowners as a direct result of the low-flying aircraft:
1 aOne of the complainants, Rebecca Sanford, testified her horse had been spooked and nearly kicked her when an ultralight [aircraft] flew over her barn. Another plaintiff, Teresa Chewning, recounted how a low flying machine “buzzed” her house and scared her children. Neither plane belonged to defendants, but both witnesses generally concluded that the craft had been attracted by the airfield. Chewning additionally noted an occasion when Brooks taxied up and down the fence line between their properties, causing the horses in her nearby pasture to stampede.
Id. at pp. 5-6, 651 So.2d at 349. Additionally, the trial court was presented with *8 detailed evidence from real estate experts regarding the issue of whether the plaintiffs’ property had diminished in value as a result of the zoning ordinance violations:
Both sides presented real estate experts to address whether plaintiffs’ neighboring property had diminished in value. Wesley Barron, a state certified appraiser, opined that a diminution in the price of appellees’ land would be caused by appellants’ ultralight activities. Ron Fa-yard, a real estate broker in the Bossier area but not a certified appraiser, testified on behalf of defendants. He noted that property in a new subdivision across the bayou from the ultralight landing area had significantly increased in value over the last few years, and that he had not observed any adverse effect on area sales caused by the nearby ultralights. On cross, however, he admitted that the subdivision land is buffered by a line of trees along the waterway.
Id. at p. 6. Considering the evidence that plaintiffs had presented with regard to individualized, specific damages, as well as evidence of harm resulting from the landing strip’s operation, the Court held that the plaintiffs had established “significant adverse effects upon the value and enjoyment of their property.” Id. Notably, the Court also held that the airport’s activities “specially damaged [the] plaintiffs.” Id. at p. 7.
IfiSimilarly, in Redfearn v. Creppel, 436 So.2d 1210, 1211 (La.1983), affd in part, rev’d in part on other grounds, 455 So.2d 1356 (La.1984), also relied upon by Appellants, involved two plaintiff homeowners seeking injunctive relief from a hotel’s alleged violations of zoning ordinances. In Redfeam, in contrast to the instant case, the plaintiffs put on evidence of actual traffic congestion, including the blockage of individual driveways by parked vehicles, and increased litter in the area:
Carol Jean Gibson is the owner of the property located at 1615 Peniston Street, which is within 100 feet of The Columns Hotel. She testified that as a result of the operation of the bar and restaurant at The Columns there has been more congested parking in the area, incidents in which her driveway is blocked by parked vehicles, an increase of trash which appears on her lawn between 10 p.m. and 7:30 a.m., and she sees “drunks” coming from the direction of The Columns.
Lynn Redfearn, a resident of 3717 Carondelet Street, which is one block from The Columns, attested to the dangerous and congested traffic and parking conditions which have occurred since the opening of the bar at the Columns Hotel.
The incidents of increased traffic and litter resulting from the operation of The Columns bar and restaurant was corroborated by the testimony of John Geiser, an officer of the St. Charles Avenue Committee.
We are satisfied that the plaintiffs have made a sufficient showing of harm to entitle them to seek injunctive relief in this case.
Id. at 1213.
Appellants argue that Vieux Carre Property Owners, Residents and Associates, Inc. v. Decatur Hotel Corporation, which involved an appeal by an association seeking declaratory and injunctive relief for an alleged violation of New Orleans zoning laws, is analogous to the instant case. 1999-0731, p. 1, 746 So.2d 806, 807 (La.App. 4 Cir. 11/10/99). Defendants filed an exception of no |7cause of action and/or no right of action, arguing that “the Association d[id] not list any damages in its petition and, hence, the Association has no cause of action.” Decatur Hotel, p. 2, 746 So.2d at 807. The trial court granted *9 the exceptions and dismissed the petition with prejudice. Id. On appeal, the Court “agree[d] with the trial court that the Association failed to state a cause of action,” but remanded to allow the Association the opportunity to amend its petition to assert a cause of action. Id. at p. 5-6, 808-809.
As previously noted, the three-pronged Hunt test was not applied in Decatur Hotel. The Court referenced Ramsey, Louisiana Hotel-Motel, and Associated General Contractors, acknowledging that Louisiana Courts have previously held that an organization may assert a claim on behalf of its members. Decatur Hotel, 746 So.2d 806, 808-809. Next, the Court cited Redfearn v. Creppel and Guillot v. Brooks for the principle that neighboring residents and individual landowners, respectively, may file suit to enforce zoning ordinances. Id. at 809. The Court had already determined that the Association’s petition failed to state any damages sufficient to assert a cause of action; thus, the Court could not conduct a Hunt analysis because no damages had been asserted in the petition. Accordingly, the statement in Decatur Hotel that the Association could assert a claim on behalf of its members is best understood as an affirmation of the Louisiana jurisprudence holding that an association may file suit on behalf of its members, provided that all three elements of the Hunt test are satisfied.
|sWith respect to Garden District Property Owners Association v. City of New Orleans, et al., 98 So.2d 922 (La.App. 4th Cir.1957), it is important to note that it was decided two decades prior to Hunt decision; thus, the Court did not conduct the three-part test when determining whether an association had standing. Likewise, Vieux Carre Property Owners and Associates, Inc. v. City of New Orleans, 246 La. 788, 167 So.2d 367 (La.1964) also pre-dates Hunt and Louisiana Hotel-Motel. While Garden District and VCPO-RA are indeed still good law, neither can offer guidance with respect to a Hunt analysis. Pursuant to Supreme Court and Louisiana jurisprudence, the Hunt/Louisiana Hotel-Motel test must be applied when determining whether an association has standing to assert a claim on behalf of its members, and all three elements of the test must be satisfied. See Hunt, supra; Louisiana Hotel-Motel, supra.
With respect to Ramsey River Road Property Owners Association, Inc. v. Reeves, 396 So.2d 873, 874 (La.1980), this Court finds that the instant matter is factually distinguishable. In Ramsey, the complained-of activity was construction of a bridge on the Bogue Falaya River, which the plaintiff association argued was navigable; thus, defendants could not construct the bridge without first complying with certain state and federal procedures. Ramsey, 396 So.2d at 875.
The facts of Hunt are also plainly distinguishable from the instant case. In Hunt, the issue was a North Carolina law which impacted apple growers from Washington State, the Nation’s largest producer of apples. Hunt, 432 U.S. at 336, 97 S.Ct. at 2438. The apple industry in Washington employed “a stringent, mandatory inspection program” by Washington’s Department of Agriculture | Requiring apples shipped to other states “be tested under strict quality standards and graded accordingly.” Id. The Washington apple grades were equal or superior to the USDA standards, and the scheme cost the Washington apple growers approximately one million dollars per year. Id.
North Carolina adopted an administrative regulation that “required all closed containers of apples shipped into or sold in the State to display either the applicable USDA grade or none at all,” thus express *10 ly prohibiting individual State grades, such as the Washington apple grades. Id. at 387. The impact of such a regulation upon the Washington apple growers was enormous. “Washington apple growers annually ship in commerce approximately 40 million closed containers of apples, nearly 500,000 of which eventually find their way into North Carolina stamped with the applicable Washington State variety and grade.” Id. at 337-338. The growers purchase containers that are pre-labeled with the various apple grades and varieties, fill the containers after harvest and place them in cold-storage warehouses. Id. at 338. The apples are shipped from the warehouse to meet demand throughout the year, and “after February 1 of each year, they constitute approximately two-thirds of all apples sold in fresh markets in this country.” Id. at 2439. Thus, the resulting economic harm to the Washington apple growers forced to conform to the regulation was obvious to the Court:
Since the ultimate destination of these apples is unknown at the time they are placed in storage, compliance with North Carolina’s unique regulation would have required Washington growers to obliterate the printed labels on containers shipped to North Carolina, thus giving their product a damaged appearance. Alternatively, they could have changed their marketing practices to accommodate the needs of the North Carolina market, i.e., repack apples to be shipped to North Carolina in containers bearing only the USDA grade, and/or store the estimated portion of the harvest destined for that market in such special containers. As a last resort, they could discontinue the use of the preprinted containers entirely. None of these costly and less |inefficient options was very attractive to the industry. Moreover, in the event a number of other States followed North Carolina’s lead, the resultant inability to display the Washington grades could force the Washington growers to abandon the State’s expensive inspection and grading system which them customers had come to know and rely on over the 60-odd years of its existence.
Id. at 338. Consequently, as a direct result of the regulation, the Washington apple growers were plainly “forced to alter their long-established procedures, at substantial cost, or abandon the North Carolina market [at a loss of 500,000 containers of apples].”[2] Hunt, 432 U.S. at 340, 97 S.Ct. at 2440 (emphasis added).
*11 In this case, however, the harm resulting from the complained-of activity is alleged on behalf of the Vieux Carre neighborhood as a whole, and this Court cannot provide Appellants with relief. See League of Women Voters of New Orleans, 381 So.2d at 447; Richardson v. Reeves, 600 So.2d at 140. Furthermore, |nthe harm alleged by Appellants is generally incorporeal, subjective, and hypothetical, in marked contrast to the damages alleged by the plaintiff associations in the cases cited previously herein.
Additionally, the alleged harms are not sufficiently concrete to pass muster under Louisiana Hotel-Motel. The Louisiana Supreme Court has recognized that to establish standing to assert a claim on behalf of its members, an association must demonstrate actual economic injury. Louisiana Hotel-Motel, 385 So.2d at 1197. In finding that a group of plaintiff restaurant associations had established “neither standing to prosecute nor an injury which might have been redressed,” the Court noted that Auto Dealers,[3] a case upon which plaintiffs had mistakenly relied, “not only included individual dealers among the plaintiffs, but also demonstrated actual, substantial economic injury to the dealers.” Id. (emphasis added). Accordingly, the Louisiana Supreme Court held that associations’ position was not analogous to that of the Auto Dealers plaintiffs, and standing eoüld not be established. Id. Similarly, we find that Appellants in the instant case have , failed to demonstrate a concrete economic injury to its members sufficient to satisfy the test for standing. See id.
The second prong of the inquiry, whether the interests Appellants sought to protect were relevant to its organization’s purpose, was arguably met; the VCPORA’s mission statement makes reference to “maintaining] [the French Quarter’s] quant and distinctive character.” As previously noted, however, satisfaction of only one of the elements of the three-part inquiry is insufficient to establish standing. Vieux Carre Property Owners, supra, at *8.
112Finally, although unnecessary to do so, we consider whether the claim asserted or the relief sought by the association requires the participation of the individual members. See Hunt, supra. We acknowledge that the injunctive relief sought by Appellants in this case may not necessarily require the participation of the individual members. See Louisiana Associated Gen. Contractors, Inc. v. State Through Div. of Admin., Office of State Purchasing, 95-2105, p. 7 (La.3/8/96), 669 So.2d 1185, 1191 (noting that “because the suit merely seeks injunctive and declaratory *12 relief, as opposed to monetary damages on behalf of individual contractors, neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit”). Nevertheless, even if Appellants satisfy this element, Appellants fail to establish standing because the first prong of the test has not been met.
For the foregoing reasons, the trial court’s judgment is affirmed.
AFFIRMED
BAGNERIS, J., Dissents with Reasons.
BAGNERIS, J., Dissents with Reasons.
hi respectfully dissent from the majority’s finding that the organizations in this case have failed to demonstrate a real and actual interest in the suit.
The essential function of the peremptory exception of no right of action is to test whether the plaintiff has a real and actual interest in the suit. La. C.C.P. art. 927(A)(6); La.Code of Civ. Proc. Art. 681. Its purpose is to determine whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit. It assumes that the petition states a valid cause of action and questions whether the plaintiff in the particular case has a legal interest in the subject matter of the litigation. Wirthman-Tag Construction Co., L.L.C. v. Hotard, 00-2298, 00-2299, pp. 2-3 (La.App. 4 Cir. 12/19/01), 804 So.2d 856, 859.
Applying the criteria in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), I find that Plaintiffs do have standing to bring this suit against defendants because (1) they have shown that the members of their organizations could bring a suit because of the harm (present or probable for the future) which would occur to the members; (2) they have shown the purpose for which their organizations were formed and why the claims being asserted relate to the purpose of the organization; and (3) |2they have shown that the relief being sought does not require the participation of the individual members. Accordingly, I would reverse the judgment of the trial court.

. As previously noted, a review of the record evidenced that Appellants brought the same claims before the Vieux Carre Commission, but that attempt to enjoin Appellees before the VCC was unsuccessful. Vieux Caire Property Owners, Residents and Associates, Inc. v. Hotel Royal, L.L.C., 2009-0641 (La.App. 4 Cir. 2/3/10), 2010 WL 395912, 55 So.3d 1, n. 1.

. Additionally, with regard to the analysis of the amount-in-controversy claim, the Supreme Court recognized the economic losses that the members of the apple industry had already sustained and were certain to incur in the future:
Here the record demonstrates that the growers and dealers have suffered and will continue to suffer losses of various types. For example, there is evidence supporting the District Court's finding that individual growers and shippers lost accounts in North Carolina as a direct result of the statute. Obviously, those lost sales could lead to diminished profits. There is also evidence to support the finding that individual growers and dealers incurred substantial costs in complying with the statute. As previously noted, the statute caused some growers and dealers to manually obliterate the Washington grades from closed containers to be shipped to North Carolina at a cost of from 5 to 15 cents per carton. Other dealers decided to alter their marketing practices, not without cost, by repacking apples or abandoning the use of preprinted containers entirely, among other things. Such costs of compliance are properly considered in computing the amount in controversy. Buck v. Gallagher, supra; Packard v. Banton, supra; Allway Taxi, Inc. v. City of New York, 340 F.Supp. 1120 (S.D.N.Y.), aff’d, 468 F.2d 624 (C.A.2 1972). In addition, the statute deprived the growers and dealers of their rights to utilize most effectively the Washington State grades which, the record demonstrates, were of long standing and had gained wide *11 acceptance in the trade. The competitive advantages thus lost could not be regained without incurring additional costs in the form of advertising, etc. Cf. Spock v. David, 502 F.2d 953, 956 (C.A.3 1974), rev’d on other grounds, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). Moreover, since many apples eventually shipped to North Carolina will have already gone through the expensive inspection and grading procedure, the challenged statute will have the additional effect of causing growers and dealers to incur inspection costs unnecessarily.
Both the substantial volume of sales in North Carolina the record demonstrates that in 1974 alone, such sales were in excess of $2 million and the continuing nature of the statute’s interference with the business affairs of the Commission’s constituents, preclude our saying "to a legal certainty,” on this record, that such losses and expenses will not, over time, if they have not done so already, amount to the requisite $10,000 for at least some of the individual growers and dealers. Hunt, 432 U.S. 333, 347-48, 97 S.Ct. 2434, 2443-44, 53 L.Ed.2d 383 (emphasis added)(footnote omitted).

. Louisiana Independent Auto Dealers Association v. State, 295 So.2d 796 (La.1974).